# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2299

_____

United States of America,                    *
                                             *
                 Appellee,                    *
                                             *   Appeal from the United States
        v.                                    *   District Court for the
                                             *   District of North Dakota.
Dana Deegan,                                  *
                                             *
                 Appellant.                   *

_____

Submitted:  December 9, 2008
Filed:  May 25, 2010

_____

Before COLLOTON, BRIGHT, and SHEPHERD, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Dana Deegan pled guilty pursuant to a plea agreement to second-degree murder, in violation of 18 U.S.C. §§ 1111 and 1153. The district court[1] sentenced Deegan to 121 months' imprisonment, which was the bottom of the advisory guideline range. Deegan appeals the sentence, and we affirm.

---

[1]The Honorable Daniel L. Hovland, Chief Judge, United States District Court for the District of North Dakota.

# I.

Deegan is a member of the Three Affiliated Tribes. On October 20, 1998, Deegan secretly gave birth to a baby boy in the bathroom of her home on the Fort Berthold Indian Reservation. The baby was alive and breathing when he was delivered. Deegan had kept her pregnancy hidden, and no other adult was present at the time of the delivery. Deegan's three other minor children were in the home, but they were unaware of the birth.

Approximately two hours after delivering her son, Deegan fed, cleaned, and dressed him, and then placed him in a basket. She then left the house with her three other children, intentionally leaving the baby alone without food, water, or a caregiver. Deegan did not return to her home for approximately two weeks. When she returned, she found the baby dead in the basket where she had left him. She put his remains in a suitcase, and deposited the suitcase in a rural ditch area near her residence.

On November 4, 1999, a man working on a fence line found the suitcase containing the baby's remains. He reported the discovery to law enforcement, and the Federal Bureau of Investigation ("FBI") commenced an investigation. In March 2004, Deegan voluntarily submitted a DNA sample to the FBI. Nearly three years later, in February 2007, the FBI completed mitochondrial DNA analysis on the Deegan sample and confirmed that Deegan was the mother of the deceased baby. When Deegan was interviewed by the FBI in late February 2007, she falsely claimed that the baby was stillborn. Interviewed a second time in May 2007, Deegan repeated the false story and provided a written statement to that effect.

Later during the May 2007 interview, however, Deegan admitted that her earlier statements were false and acknowledged that the baby had been born alive. She stated that she intentionally left him alone in her home, knowing that he would die. When

asked why she did so, Deegan responded that she was unable to care for a fourth child, neither she nor her common-law husband were employed, and her husband spent what little money they did have to purchase drugs.

On June 6, 2007, a grand jury returned a two-count indictment charging Deegan with first-degree murder and making false statements to the FBI. Deegan pled not guilty to both charges. On November 11, 2007, Deegan entered into a written plea agreement with the government, in which she agreed to plead guilty to one count of second-degree murder. In the factual portion of the agreement, Deegan acknowledged that the baby was born alive and breathing when she delivered him, and that she unlawfully and with malice aforethought caused his death by leaving him alone in the house for approximately two weeks. On November 30, 2007, the government filed an information charging Deegan with second-degree murder.

On December 10, 2007, Deegan pled guilty to second-degree murder. At the plea hearing, the district court noted that the sentencing guidelines in effect at the time of Deegan's offense provided for an advisory sentence of eight to ten years' imprisonment for second-degree murder. The court advised Deegan that based on "what little information" it had about the offense at the plea hearing, the court was "not comfortable" with a range of eight to ten years, because the terms of imprisonment for other defendants convicted of second-degree murder "were not even close to that range." The court remarked that there were a number of provisions in the advisory guidelines "that would justify an upward departure."

In an order filed on January 22, 2008, the court formally notified the parties that it was "contemplating an upward departure from the applicable Sentencing Guideline range," based on USSG § 5K2.8, which provides for an increased sentence where "the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim." The court expressed its view that Deegan's conduct "was unusually heinous, cruel, and brutal," but stated that it would await review of the presentence investigation

report ("PSR"), psychological evaluations, and a review of relevant case law before making a final decision on sentencing.

Applying the 1997 sentencing guidelines in effect at the time of the offense, the PSR recommended an advisory sentencing range of 121 to 151 months' imprisonment, which corresponded to a total offense level of 32 and a criminal history category of I. The total offense level represented a base offense level of 33, USSG § 2A1.2 (1997), a two-level upward adjustment for knowledge of a vulnerable victim, *id.* § 3A1.1(b), and a three-level decrease for acceptance of responsibility, *id.* § 3E1.1(a), (b). Deegan objected to the two-level vulnerable-victim adjustment, arguing that there had been no factual finding that the infant was vulnerable, and that she had not admitted as much in the plea agreement.

Following preparation of the PSR, both parties submitted sentencing memoranda to the court. Deegan again objected to the two-level vulnerable-victim adjustment. She also urged the court to vary from the advisory guidelines and sentence her to probation or to a very short period of incarceration. She based her argument for leniency on what she described as her "psychological and emotional condition" at the time of the offense, her history as a victim of abuse, and the fact that she acted impulsively, among other reasons.

As support, she submitted a report prepared by Dr. Phillip Resnick, an expert in "neonaticide." "Neonaticide" is a term coined by Resnick to describe the killing of an infant within the first twenty-four hours following birth. *See* Susan Hatters Friedman et al., *Child Murder by Mothers: A Critical Analysis of the Current State of Knowledge and a Research Agenda*, 162 Am. J. Psychiatry 1578, 1578 (2005). The report addressed what Resnick viewed as an "extraordinary number of mitigating circumstances," and expressed the opinion that a prison sentence was not necessary to deter other women from committing neonaticide. The report concluded that Deegan suffered from an extensive history of abuse throughout her childhood and as

an adult, suffered from major depression and dissociation at the time of the homicide, acted impulsively in leaving her baby alone, presented a very low risk of reoffending, and did not merit a lengthy prison sentence, especially because other women convicted in state court of committing similar offenses were usually sentenced to no more than three years in prison.

At the sentencing hearing on May 18, 2008, the district court adopted the sentencing guideline calculation in the PSR. The court agreed with the probation office that the vulnerable-victim enhancement was warranted, and that Deegan's advisory range was 121 to 151 months' imprisonment. Finally, after calling Dr. Resnick to testify about his report and hearing arguments from counsel and testimony from Deegan herself, the court sentenced Deegan to 121 months' imprisonment.

On appeal, Deegan argues that the sentence of 121 months' imprisonment is unreasonable, because the advisory guideline for second-degree murder is not based on empirical data and national experience, and because the sentence imposed is greater than necessary to comply with the statutory purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). As we understand Deegan's brief on appeal, she argues that the district court committed both procedural and substantive errors when imposing sentence. Deegan raised no procedural objection in the district court, so we consider her claims of procedural error under the plain-error standard, *United States v. Gray*, 533 F.3d 942, 945 (8th Cir. 2008), which requires as conditions for relief that Deegan show an obvious error that affected her substantial rights and seriously affected the fairness, integrity, or reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993). No objection was required to preserve Deegan's substantive claim that the sentence imposed is unreasonably long with regard to § 3553(a), *United States v. Wiley*, 509 F.3d 474, 476-77 (8th Cir. 2007), but we review the substantive reasonableness of the sentence under a deferential abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 41 (2007).

II.

A.

Deegan appears to raise four alleged procedural errors at sentencing. One is that the district court "failed on the record to engage in any meaningful discussion whatsoever of the § 3553(a) factors." The Supreme Court in *Gall* explained that a sentencing court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." 552 U.S. at 50. Deegan did not object to the adequacy of the district court's explanation or request any elaboration. On plain error review, we conclude that the explanation is not obviously inadequate.

As the Supreme Court has explained, "[t]he appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances." *Rita v. United States*, 551 U.S. 338, 356 (2007). "The law leaves much, in this respect, to the judge's own professional judgment." *Id.* "[A] district court is not required to provide a 'full opinion in every case,' but must 'set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority.'" *United States v. Robinson*, 516 F.3d 716, 718 (8th Cir. 2008) (quoting *Rita*, 551 U.S. at 356). Sentencing courts need not "categorically rehearse the § 3553(a) factors on the record, as long as it is clear that the court considered those factors." *United States v. Hernandez*, 518 F.3d 613, 616 (8th Cir. 2008). Nor have we required district courts to make specific findings on the record about each § 3553(a) factor. *Perkins*, 526 F.3d at 1110. "[A]ll that is generally required to satisfy the appellate court is evidence that the district court was aware of the relevant factors." *Id.*

The district court in this case said plenty to avoid an obvious shortcoming under a plain error standard of review. The court twice stated that it had "carefully

-6-

considered" the § 3553(a) factors, even remarking that it had "spent many, many days and nights thinking about this case." The court listed nearly all of the § 3553(a) factors on the record. Dr. Resnick, the expert who reported on Deegan's psychological condition, structured his testimony at the sentencing hearing around many of the § 3553(a) factors, and cross-examination highlighted other statutory factors. The court heard all of this testimony and took it into account. The court read Resnick's written report, which was explicit in its reference to the § 3553(a) factors, "at least three times." The court twice stated that it had carefully reviewed the PSR, the parties' sentencing memoranda, the psychological evaluation of Deegan by another doctor, the many letters of support filed on her behalf, and the DVD presentation by her family. *See United States v. Henson*, 550 F.3d 739, 743 (8th Cir. 2008) (observing that the presentence report contains extensive information regarding the factors under § 3553(a)).

In explaining why it chose a sentence of 121 months' imprisonment rather than a greater punishment, the court acknowledged that Deegan's life had not been "easy," and that it had been plagued with physical abuse and sexual abuse. Referring back to its statement at the plea hearing that it was likely to impose a sentence *above* the advisory range of eight to ten years, the court observed that Resnick's report and testimony were "helpful and insightful," and that the court had gained "far better insight" into the case after reviewing the report. The court told Deegan that it had "real compassion for [her] and [her] family and what [she had] gone through," including the fact that she had three children and that her brother had been murdered. The court said that it "underst[ood] why [Deegan] took the steps that she did in 1998," and that "under the circumstances," a sentence under the 2007 guidelines in effect at the time of sentencing, *i.e.*, 19.5 to 24.5 years' imprisonment, would not have been fair.

But the court also thought a lesser sentence would not be sufficient, explaining that it must "ensure that justice is done," and that it could not "ignore the fact that

there was an innocent life that was lost." The court remarked that justice in this case probably "lies between the extremes of public opinion," and that the advisory range of 121 to 151 months' imprisonment was reasonable for "a case of this nature."

This discussion is sufficient to permit meaningful appellate review and to ensure the public that Deegan's case was given fair consideration. In the face of this record, which shows a district judge deliberating at length over a difficult case, and even changing his tentative conclusion between the plea hearing and the sentencing hearing, we cannot agree with our dissenting colleague that the district court "exercised no discretion." *Post*, at 62. Deegan has not established plain error that would require a remand for a more elaborate statement of reasons.

B.

Deegan also argues that the court procedurally erred by treating the advisory guidelines as mandatory. *Gall*, 552 U.S. at 51. This contention is based on an isolated statement by the district court at the sentencing hearing, to which Deegan lodged no objection:

> In this case, the sentencing guidelines provide for a sentence range of 121 to 151 months. That's 10 to 12-and-a-half years. *I'm required to impose those guidelines that were in effect in October of 1998.* If the guidelines that were in effect today were imposed, your sentence would be in the range of 19-and-a-half to 24-and-a-half years.

(S. Tr. at 60) (emphasis added).

The court evidently misspoke when it used the word "impose" (rather than "consider"), because the record as a whole makes clear that the court understood its discretion to sentence outside the advisory guideline range. There is no reason to believe that the district court applied the guidelines as mandatory, and if Deegan had

-8-

objected at sentencing to the word "impose," we are confident that the court would have corrected itself.  Elsewhere, the court clearly explained that it was aware of its discretion to vary from the advisory guideline range:

> I'm also familiar with the recent decisions from the United States Supreme Court in the cases of *Gall* and *Kimbrough* which have established that *district court judges around the country in the federal system have discretion to impose nonguideline sentences or variances from the sentencing guidelines.  And I'm equally aware of my authority and my discretion to impose a nonguideline sentence*.
>
> . . . .
>
>  . . . *I'm aware of my discretion and authority to impose a nonguideline sentence or to depart from the guidelines.  I have chosen* in this case to impose a guideline sentence.  *I'm not going to exercise my discretion and depart and impose a nonguideline sentence* because I believe that the sentencing range that's been provided for in the sentencing guidelines in this particular case is reasonable.

(S. Tr. 56, 58-59) (emphases added).  On Deegan's contention that the district court treated the guidelines as mandatory, there is no plain error warranting relief.[2]

---

[2]We disagree with the dissent that the district court's description of the chosen sentence as "reasonable" demonstrates that the court applied an impermissible presumption of reasonableness to the advisory guideline sentence, *post*, at 44, or that the court misunderstood its duty under § 3553(a) to select a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of § 3553(a)(2).  *Post*, at 50.  As in *United States v. Vaughn*, 519 F.3d 802, 805 (8th Cir. 2008), where the sentencing court said it was to impose a "reasonable sentence," there is no plain error, because the record as a whole shows that the court followed the proper procedure under *Gall*.

C.

Deegan also contends that the district court committed procedural error by considering the advisory guideline range that applied to Deegan's offense under the 2007 sentencing guidelines. Deegan committed the offense in 1998, and the court calculated her advisory range according to the 1997 guidelines, which were in effect at the time of the offense. The court apparently followed the rule that application of the guidelines in effect at the time of sentencing would violate the Ex Post Facto Clause, *see United States v. Bell*, 991 F.2d 1445 (8th Cir. 1993); USSG § 1B1.11(b), although the endurance of that rule is an open question in this circuit after *United States v. Booker*, 543 U.S. 220 (2005), now that the guidelines are merely a starting point that a court must consult and take into account. *See United States v. Anderson*, 570 F.3d 1025, 1033 n.7 (8th Cir. 2009) (assuming, without deciding, that the Ex Post Facto Clause applies to a district court's application of the sentencing guidelines after *Booker*); *compare, e.g.*, *United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2006) (holding that use of the guidelines in effect at time of sentencing does not violate Ex Post Facto Clause after *Booker*), *with United States v. Turner*, 548 F.3d 1094, 1098-1101 (D.C. Cir. 2008) (disagreeing with *Demaree*).

Although the court used the 1997 guidelines as the initial starting point, it also discussed the advisory range that would apply under the 2007 guidelines. The court observed that if Deegan had been sentenced under the 2007 guidelines, her advisory sentence would have been almost twice as long as the sentencing range under the 1997 guidelines. The court also noted that if Deegan had been convicted of voluntary manslaughter rather than second-degree murder, then her advisory range under the 2007 guidelines would be roughly the same range as the advisory range for second-degree murder under the 1997 guidelines. With this background, the court concluded:

> I guess what I'm trying to say is that if we used guidelines today, the
> sentence would be double what you're currently looking at, and I don't

-10-

think that's fair under the circumstances. But when I reflect upon what a voluntary manslaughter charge carries under the current guidelines and what second degree murder carries under the guidelines that existed in 1998, I believe that those are reasonable guidelines for a case of this nature.

Deegan did not object to the district court's reference to the 2007 guidelines, and we see no obvious error in the court's consideration of that information. Now that the guidelines are merely advisory, district courts are free to vary from the advisory range "based solely on policy considerations," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (internal quotation omitted), or to sentence within the advisory range based on policy considerations. The 2007 guidelines simply represent another policy view – different from the view embodied in the 1997 guidelines – of the appropriate sentence under § 3553(a) for second-degree murder or voluntary manslaughter in a run-of-the-mine case. The court was free to consider that view as part of its analysis of the appropriate sentence for Deegan under § 3553(a). There was no plain procedural error.

D.

Deegan's remaining procedural argument is that the district court erred by assuming that the advisory guideline for second-degree murder was the product of empirical data and national experience. She points to this excerpt from the district court's comments at sentencing:

We have sentencing guidelines in the federal system that are designed to ensure that sentences are consistent and uniform throughout the country for people that commit this type of crime with the same type of criminal history that you have. The sentencing guidelines have been in effect for almost 20 years, and they are designed to provide some honesty in sentencing and to achieve some consistency in the federal system, and they're based upon an analysis of hundreds of thousands of cases. Every

-11-

year there are hundreds of thousands of cases that – in which defendants are sentenced around the country, and the Sentencing Commission compiles all that data and they try to develop sentencing guidelines that are fair and are reasonable.

Deegan did not object to these comments at sentencing, and we see no obvious error that warrants relief.

Insofar as Deegan argues that the court procedurally erred by "selecting a sentence based on clearly erroneous facts," *see Gall*, 552 U.S. at 51, we disagree. The court's discussion of the guidelines was an accurate statement about the general purpose and methodology behind the sentencing guidelines. *See generally* USSG Ch. 1, Pt. A, intro. comment. The court never suggested that the Sentencing Commission based the guideline on an analysis of hundreds of thousands of "neonatacide" cases, or that Deegan's offense was a typical fact pattern for second-degree murder.

The district court may have believed that the second-degree murder guideline considered in Deegan's case was based on empirical data and national experience, but Deegan has not shown that this premise would have been incorrect. Citing *United States v. Grant*, No. 07-242, 2008 WL 2485610, at *4-5 (D. Neb. June 16, 2008), Deegan argues that amendments to the murder guidelines promulgated *in 2002, 2004, 2006, and 2007* were not based on empirical data and national experience. But whatever the merits of that position, these amendments say nothing about how the Sentencing Commission established the *1997* guideline for second-degree murder, on which Deegan's advisory range was based.[3]

---

[3]In its Fifteen Year Report, the Commission explained that murder was one of the offenses for which the original Commission, "either on its own initiative or in response to congressional actions, established guideline ranges that were significantly more severe than past practice." *See* U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 47 (2004). The report further

Even with respect to the 1997 guideline, moreover, the district court simply treated the advisory guideline range as an initial starting point, while determining the final sentence after consideration of all of the § 3553(a) factors taken as a whole. There is no showing that an erroneous assumption about the underlying basis for the second-degree murder guideline drove the determination of Deegan's sentence.

In sum, Deegan has not identified an obvious procedural error at sentencing. The district court correctly calculated the advisory guideline range, allowed the parties to present evidence and argument regarding the sentence to be imposed, recognized its discretion to impose a sentence outside the advisory range, considered all of the § 3553(a) factors, determined the final sentence based on those factors, and adequately explained its rationale.

## III.

### A.

We also conclude that Deegan's sentence at the bottom of the advisory guideline range is substantively reasonable. We review the substantive reasonableness of the sentence under a deferential abuse-of-discretion standard, *see Gall*, 552 U.S. at 41, cognizant that "it will be the unusual case when we reverse a district court sentence – whether within, above, or below the applicable Guidelines range – as

observed that for violent crimes, "the Commission was careful to ensure that average sentences . . . at least remained at current levels, and it raised them where the Commission was convinced that they were inadequate." *Id.* at 68. It explained that "[f]or murder and aggravated assault, the Commission felt that past sentences were inadequate since these crimes generally involved actual, as opposed to threatened, violence." *Id.* Nothing in these statements is inconsistent with an assumption that the second-degree murder guideline was based on empirical data and national experience, although the data and experience may have led the Commission to conclude that the average sentence should be increased.

-13-

substantively unreasonable." *United States v. Feemster*, 572 F.3d 455, 464 (8th Cir. 2009) (en banc) (internal quotation omitted). While many critics of the mandatory federal sentencing system believed that the guidelines resulted in excessive terms of imprisonment, the post-*Booker* system is not a one-way ratchet in favor of leniency. A district judge who favors a tough sentence is entitled to the same degree of deference as a district judge who opts for a lesser punishment.

Where, as here, a sentence imposed is within the advisory guideline range, we typically accord it a presumption of reasonableness. *See United States v. Harris*, 493 F.3d 928, 932 (8th Cir. 2007). The presumption "simply recognizes the real-world circumstance that when the judge's discretionary decision accords with the Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable." *Rita*, 551 U.S. at 350. But even if we do not apply such a presumption here, on the view that Deegan's offense is not a "mine run" second-degree murder, the district court did not abuse its considerable discretion by selecting a sentence of 121 months' imprisonment.

The record in this case includes evidence in aggravation and mitigation. As the district court observed in its presentencing order, a court reasonably could view Deegan's offense as "unusually heinous, cruel, and brutal," and deserving of harsh punishment. She left a newborn baby alone in a basket in an empty house without food and water for two weeks until the child died. Deegan countered with testimony from an expert who believes, among other things, that women who commit "neonaticide" are unlikely to reoffend, and that harsh punishment of such an offender is unlikely to deter others from committing the same offense. Deegan also presented evidence of her troubled personal history and family circumstances, and of course we share our dissenting colleague's condemnation of violence against American Indian women.

Deegan's mitigating evidence convinced the district court that a sentence of more than ten years, which the court had contemplated at the time of the guilty plea, was greater than necessary to satisfy the statutory purposes of sentencing. But we are firm in our view that the district court did not abuse its discretion by refusing to impose a more lenient sentence. Whatever the deterrent effect of this sentence, general or specific, and whatever Deegan's personal history, the court was entitled to consider the need for the sentence imposed to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The district court was justified in saying that it could not "ignore the fact that there was an innocent life that was lost," and that there was a "need to ensure that justice is done." The court believed that justice in this case "lies between the extremes of public opinion," and that may be so. There likely are those, like Deegan's expert, who believe that a term of imprisonment is unnecessary, and there may be others who feel that no term of imprisonment is too long for one who murders a helpless infant in this manner. We need only determine whether the district court's middle ground is a permissible choice. Applying a deferential abuse-of-discretion standard, we conclude that the sentence of 121 month's imprisonment is reasonable with regard to § 3553(a).

B.

Our dissenting colleague contends that Deegan's sentence is unreasonably long, and that we should direct the district court to impose a shorter term of imprisonment. We believe that such a disposition would be inconsistent with the substantial deference now owed to the judgments of the sentencing courts. *Cf. United States v. Burns*, 577 F.3d 887, 896 (8th Cir. 2009) (en banc) (Bright, J., concurring) (asserting that *Gall* "puts the discretion at sentencing in the district court, just where it should be, with due regard for the guidelines and the statutes relating to the goals of sentencing. Appellate courts are not sentencing courts."). The guidelines are advisory only, and we "must review all sentences – whether inside, just outside, or significantly

-15-

outside the Guidelines range – under a deferential abuse-of-discretion standard." *Gall*, 552 U.S. at 41. The question is not whether the former mandatory guideline system would have called for a downward departure below the mandatory guideline range, *cf. post*, at 38-41, but whether the district court's sentence of 121 months' imprisonment is reasonable in light of the statutory considerations described in § 3553(a).

To support its conclusion that the district court's chosen sentence was unreasonably harsh, the dissent cites a case involving a student at North Dakota State University ("NDSU") who was prosecuted in North Dakota state court and sentenced to probation. The record of this case includes almost nothing about the NDSU case. Defense counsel stated that his summary, recounted by the dissent, *post*, at 56, was drawn from a newspaper article. The district court surely did not abuse its discretion by failing to conform Deegan's federal sentence to a North Dakota state court case about which no evidence was presented.

We disagree, moreover, with the dissent's contention that the district court should have considered the "disparity" between Deegan's sentence and the sentence that may have been imposed if Deegan, like the NDSU student, had been prosecuted in state court. *Post*, at 56-57, 59, 65-66. This argument contradicts the well-settled proposition that "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), refers only to disparities among *federal* defendants. It would have been error for the district court to consider potential federal/state sentencing disparities under § 3553(a)(6). *United States v. Jeremiah*, 446 F.3d 805, 807-08 (8th Cir. 2006) ("Unwarranted sentencing disparities among federal defendants remains the only consideration under § 3553(a)(6) – both before and after *Booker*."); *United States v. Deitz*, 991 F.2d 443, 447 (8th Cir. 1993) ("If, at the time of sentencing, federal courts were to take into consideration a potential state sentence based upon similar state-charged offenses, the Sentencing Commission's goal of imposing uniformity upon

federal sentences for similarly situated defendants would be impeded, not furthered.").[4]

*     *     *

For the foregoing reasons, we conclude that the district court did not commit plain procedural error, and the court's sentence of 121 months' imprisonment is not substantively unreasonable with regard to 18 U.S.C. § 3553(a). The judgment of the district court is affirmed.

**BRIGHT**, Circuit Judge, dissenting.

I respectfully dissent.

This case concerns the crime of neonaticide, which is the killing of a newborn child on the first day of life. This crime is practically unknown in the federal courts. Neonaticide is a crime relating to family and domestic concerns and, thus, federal courts do not generally deal with these crimes. Indeed, excluding habeas cases, my research has disclosed only one other reported federal case discussing and deciding a neonaticide crime. *See United States v. Tom*, 494 F.3d 1277 (10th Cir. 2007), *rev'd and remanded to* 327 F. App'x 93 (10th Cir. 2009).

---

[4]Even if two different sentences had been imposed in federal court, moreover, one district judge has no obligation after *Booker* to follow the decision of another district judge. *Cf. post*, at 41 & n.25. District judges now are permitted to apply their own policy views when determining what punishment is sufficient for a particular offense under 18 U.S.C. § 3553(a), *Spears v. United States*, 129 S. Ct. 840, 843 (2009) (per curiam); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007), and there inevitably will be some disparity in the sentencing of similarly-situated offenders. *Booker*, 543 U.S. at 263 ("We cannot and do not claim that use of a 'reasonableness' standard will provide the uniformity that Congress originally sought to secure.").

In the view of this judge, the procedure followed and the imposition of a ten-year-plus prison sentence on Ms. Deegan, a young American Indian woman, represents the most clear sentencing error that this dissenting judge has ever seen.[5]

For reversal, the dissent relies on the following Supreme Court cases: *Gall v. United States*, 552 U.S. 38 (2007), *Rita v. United States*, 551 U.S. 338 (2007), *Koon v. United States*, 518 U.S. 81 (1996), and the holdings in *United States v. Alvizo-Trujillo,* 521 F.3d 1015 (8th Cir. 2008), and *United States v. Greene*, 513 F.3d 904 (8th Cir. 2008). *See also Kimbrough v. United States*, 552 U.S. 85, 91, 96, 109 (2007) (discussing and commenting on sentencing procedure and stating the greatest respect to variance from guidelines when particular case is outside the "heartland").

---

[5]As a federal judge, I had never heard of the term "neonaticide" nor encountered a case of neonaticide until this case. From reading the record, I daresay the same lack of knowledge existed in the district court personnel until neonaticide was explained by Dr. Phillip Resnick. The defense counsel, William D. Schmidt of Bismarck, North Dakota, an assistant public defender, should be commended for his research on the subject and in bringing Dr. Resnick to testify about neonaticide.

This judge has read and reviewed several hundred federal sentencing cases. Of those, the procedure and sentence here is among the most grossly wrong and unfair that I have ever encountered. The result: a harsh, discriminate, and improper sentence upon an American Indian woman living on a reservation. The conduct of the district court in this case and the majority's affirmance violates every sentencing principle enunciated by the Supreme Court after *United States v. Booker*, 543 U.S. 220 (2005).

This one of a kind sentence by a federal sentencing judge, not a state judge as would be the usual case, occurred only by reason of the defendant's residence on an Indian reservation in North Dakota. I justify the length of this dissent on the basis that every aspect of the sentencing procedure and the substance of the sentence deserves careful examination. This federal court on appeal should not approve a prison sentence for this reservation crime which this judge believes is unfair and improper under the law and facts.

-18-

# I.

## SUMMARY OF CONTENTIONS AND STANDARD OF REVIEW

### A. Summary of Contentions

Ms. Deegan's crime consisted of a special sort of homicide called "neonaticide," well documented in medical and legal literature, which describes the conduct of a parent, ordinarily the mother, who is often suffering from depression or other mental illness causing the death of an infant child within twenty-four hours of birth.

First, Ms. Deegan's conduct as neonaticide does not now, nor has it ever, come within the "run-of-the-mine" guidelines for second-degree murder, the charge to which Ms. Deegan pleaded guilty. But the district court mistakenly believed that this case fell within the second-degree murder guidelines. Thus, the sentence imposed was procedurally gross error.

Second, the district court presumed that the guidelines were reasonable. This is plain error.

Third, because this case is outside the heartland of second-degree murder cases, the district court's 18 U.S.C. § 3553(a) analysis was flawed at its beginning, and this case required imposition of a sentence completely apart from the guidelines and under § 3553(a). This the district court did not do.

Fourth, analysis of the § 3553(a) factors demonstrates that Ms. Deegan's sentence is substantively unreasonable. The district court's approach to sentencing served to elevate a guidelines sentence above an individualized assessment of the facts

and circumstances of this case. Each error compounded the next one and these mistakes require reversal and remand.

Finally, the failure to follow proper sentencing procedures and methodology led to a highly excessive sentence for Ms. Deegan. Her crime requires a different approach than taken by the district court and approved by the majority.

## B. Standard of Review

I express my disagreement with the majority's application of plain error in reviewing this sentence. In my view, defense counsel preserved the errors argued on appeal.

The majority asserts:

> On appeal, Deegan argues that the sentence of 121 months' imprisonment is unreasonable, because the advisory guideline for second-degree murder is not based on empirical data and national experience, and because the sentence imposed is greater than necessary to comply with the statutory purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). As we understand Deegan's brief on appeal, she argues that the district court committed both procedural and substantive errors when imposing sentence. Deegan raised no procedural objection in the district court, so we consider her claims of procedural error under the plain-error standard. *United States v. Gray*, 533 F.3d 942, 945 (8th Cir. 2008) which requires as conditions for relief that Deegan show an obvious error that affected her substantial rights and seriously affected the fairness, integrity, or reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993). We review the substantive reasonableness of the sentence under a deferential abuse-of-discretion standard. *Gall v. United States*, 128 S. Ct. 586, 597 (2007).

Maj. op. at 5.

Further, the majority reviews the following under the plain error standard: (a) the district court's failure to meaningfully discuss the § 3553(a) factors, *id.* at 6; (b) treating the advisory guidelines as mandatory, *id.* at 9; (c) procedural error by applying the 2007 Guidelines to the instant offense, *id.* at 10; and (d) applying the second-degree murder guidelines to "this type of crime." *Id.* at 11.

Comparing the sentencing transcript with Ms. Deegan's brief establishes that these errors were asserted in the district court and raised on appeal. At sentencing, defense counsel, in responding to the prosecutor's recommendation for a guideline sentence of 121 months, asserted that: (a) the guideline sentence was far greater than necessary (Sent. Tr. 46-47); (b) such a sentence was not warranted under the § 3553(a) factors (Sent. Tr. 46-52); (c) a guideline sentence would result in a sentencing disparity as compared to a neonaticide sentence imposed in a North Dakota state court (Sent. Tr. 50-53); and (d) a variance, a non-guideline sentence, should be imposed after proper consideration of the § 3553(a) factors (Sent. Tr. 55-56, 59). The district court clearly recognized the request of defense counsel when the court said, "<u>The request in this case is for the imposition of a variance or a nonguideline sentence to be imposed in accordance with 18 USC Section 3553(a).</u>" Sent. Tr. 56 (emphasis added).

The contentions raised on appeal, *see* Appellant's Brief at 19-24, that the sentence was "unreasonable," "greater than necessary," and that a guideline sentence should not apply to Ms. Deegan, were the same arguments raised before the district court.

Defense counsel should not need to say more to preserve error in a criminal sentence. Ms. Deegan requested a non-guideline sentence and stated reasons in support of that recommendation. When defense counsel asserted that the prosecutor's recommendation called for a sentence that was flawed and excessive, and requested a lesser sentence, the sentencing issue should be considered fully preserved. *See Rita*,

-21-

551 U.S. at 345 (error raised), 351 (sentencing procedures discussed); *but see United States v. Bain*, 586 F.3d 634 (8th Cir. 2009).

To state that matters raised by Ms. Deegan should be considered as plain error is incorrect. But in any event, the procedural and substantive mistakes here are great and require reversal under any standard of review–plain error or preserved error.[6]

As will be discussed more fully, the prosecutor mistakenly told the sentencing judge:

> The United States believes that the Sentencing Commission took into account these type of events, these type of crimes when it put together sentencing guidelines such as exist in the 1997 edition. Given that fact, Your Honor, we believe that a guideline sentence would effectively meet the requirements of Section 3553, all of those goals of sentencing.

---

[6]The dissent recognizes that in the usual case where the crime is in the heartland of the guidelines, the claim that the court did not fully consider the § 3553(a) factors will be plain error unless the defendant objects to the sentencing judge's analysis of the § 3553(a) factors. *See, e.g.*, *United States v. Gray*, 533 F.3d 942, 945 (8th Cir. 2008); *Alvizo-Trujillo*, 521 F.3d at 1018. But here we have a distinctly different situation. This crime did not fit the guideline because it was outside the heartland. The request by defense counsel here was for "a nonguideline sentence to be imposed in accordance with 18 USC Section 3553(a)." Sent. Tr. 56. Moreover, the circumstances here squarely come within 18 U.S.C. § 3553(b)(1), which states that "[i]n the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in [§ 3553] subsection (a)(2)."

Thus, when Ms. Deegan requested a non-guideline sentence, and the sentencing judge denied the request and imposed a guideline sentence, nothing further needed to be said to preserve the error. The failure to sentence completely outside the guidelines, in light of the record here, should be reviewed as preserved error.

Sent. Tr. 43 (emphasis added). The sentencing judge adopted and echoed that principle in imposing a guideline sentence of ten years and one month (121 months) imprisonment, echoing a resounding "yes" to this incorrect advice as the court said the guidelines are for people like you who "commit this type of crime with the same type of criminal history that you have." Sent. Tr. 59. And further adding, "I'm required to impose those guidelines . . . ." *Id.* Such statements imply more than a presumption that the guidelines apply to Ms. Deegan and constitute plain error. Thus, there exists plain error in sentencing procedure leading to an excessive, improper, and unfair sentence. *See Alvizo-Trujillo*, 521 F.3d at 1018.

## II.

## BACKGROUND

To understand the errors in sentencing, this case requires a full accounting of Ms. Deegan's life. All of the facts discussed below were before the district court at the sentencing hearing and were not disputed by the government.[7]

### A.  Childhood Abuse

Ms. Deegan's life is marked by a history of extensive and cruel abuse. Her alcoholic father beat her on an almost daily basis and dominated every aspect of life in the Deegan family. Ms. Deegan reported having out-of-body experiences during the beatings, as if she was watching herself being assaulted from outside of her body. Some of the beatings were so severe that her father kept her home from school to

---

[7]Dr. Resnick, the expert who examined Ms. Deegan, testified that he had reviewed FBI reports, family and medical records, and an interview with Mr. Hale and had not found any major contradictions. In other words, the supporting documents in the case "substantiated Ms. Deegan's version of what had gone on in her life." Sent. Tr. 16.

avoid reports to Child Protective Services. She and her siblings were eventually removed from her parents' house due to the abuse, placed in a variety of foster homes, and periodically returned to her parents' house. While in foster care, Ms. Deegan was separated from her siblings where she experienced physical abuse from some of her foster family members. In conversation with Dr. Resnick, Ms. Deegan said, "I think I will be forgiven [by my maker]. I've lived my hell throughout my childhood." Add. 2, p.12 (Resnick Report).

Ms. Deegan also suffered extensive and cruel sexual abuse. At five years of age, her father's drinking buddies began sexually abusing her. By age nine, five or six perpetrators had forced her to participate in oral, vaginal, and anal sex. One of the perpetrators held her head under water several times to make her submissive and threatened her so she would not disclose the abuse.[8] At age eleven, the sexual abuse ended when Ms. Deegan finally disclosed the abuse to her mother. Her father responded by beating her for being a "slut and allowing it to happen." Add. 2, p. 5 (Resnick Report).

Ms. Deegan spent much of her childhood caring for and protecting her six younger siblings. Her siblings reported that she frequently suffered physical abuse in their stead. As an adult the abuse continued and Ms. Deegan protected her siblings from her father's alcoholic, depressive, and abusive states. On one occasion, her father attacked her while she was pregnant with her second child. She jumped through a window to escape. Add. 2, p. 7 (Resnick Report).

---

[8]In today's world we speak of similar conduct as a form of torture–water boarding. The abuse this child suffered is almost beyond imagination.

## B. Abuse from Shannon Hale

At age fifteen, Ms. Deegan began a relationship with Shannon Hale, the son of one of her foster parents. Mr. Hale continued the abuse. On one occasion, after Mr. Hale physically assaulted her, Ms. Deegan was admitted to a psychiatric hospital for thirty days to receive assistance for the domestic violence she had endured. She bore four children fathered by Mr. Hale, including the infant victim in this case.

After Ms. Deegan's third child was born, she became depressed. At this time in her life, Mr. Hale was physically abusing her two to three times per week, forcing her to have sexual intercourse with him, and refusing to care for their children.[9] He was not present at any of the births or to take Ms. Deegan home after the deliveries of the children. Mr. Hale continued abusing Ms. Deegan throughout their relationship, including during her pregnancies. Prenatal care records document that two days before she delivered their third child, Mr. Hale choked her and threw her onto gravel, causing injuries that persisted for several months.[10]

---

[9]FBI reports support Ms. Deegan's account of the extensive abuse she suffered. Mr. Hale acknowledged in an interview with the FBI that he had physically, emotionally, and verbally abused Ms. Deegan on a regular basis. Mr. Hale further acknowledged that he was a bad husband, Ms. Deegan was a good woman, and Ms. Deegan had done a good job raising their children without his assistance.

[10]Ms. Deegan's medical records document this injury:

7/29/97: Twenty-four year old patient comes in to evaluate injuries sustained in an altercation with her boyfriend last night. She is 37 weeks pregnant. She wishes to press charges. Her boyfriend was inebriated. Her boyfriend was with another woman. A brutal fight ensued ending up with the patient being thrown out on the gravel with her left leg extended at a considerable angle and this caused a major injury we are now inspecting. The pregnancy seems to be unaffected. Diagnosis: Multiple contusions and abrasions. Hip ligament strain left, moderately severe. (She had her baby two days later.)

Despite the abuse, Ms. Deegan did not leave Mr. Hale permanently because he repeatedly assured her that he would reduce his drinking and stop abusing her. Ms. Deegan reported that she sometimes went to live with her parents when the abuse was most severe, but then her father would physically and verbally abuse her. Ms. Deegan also explained that she did not feel that she could leave Mr. Hale because of her relationship with his mother. Ms. Deegan reported that Mr. Hale's mother "seemed to make things okay," caused her to feel safe, and encouraged her to stay with Mr. Hale for the children's sake. Ms. Deegan feared that if she left Mr. Hale, his mother, a prominent member of the Indian community, would acquire custody of her children.[11]

When Ms. Deegan learned she was pregnant with a fourth child (the child victim), she did not believe she was really pregnant. Ms. Deegan reported she had not developed a plan for coping with the birth of a fourth child because she had put the pregnancy out of her mind. She had previously suffered three miscarriages. She reported feeling so depressed that she could barely take care of herself and her three children.

Ms. Deegan's state of despair and depression was not merely the result of the physical, verbal, and sexual abuse she suffered. Ms. Deegan lived in extreme poverty and isolation. Both Ms. Deegan and Mr. Hale were unemployed. Ms. Deegan

___

Add. 2, p.16 (Resnick Report).

[11]Greek mythology, as related by Homer in the *Odyssey*, tells the tale of Scylla and Charybdis and provides an apt metaphor of Ms. Deegan's dire circumstances. The story relates that two sea monsters, Scylla and Charybdis, guarded the Strait of Messina between Sicily and Calabria in Italy and gave sailors inescapable threats–pass close to Scylla and be eaten by the monster, or veer to the other side closer to Charybdis and be sucked in and destroyed by a whirlpool. S.H., Butcher and A. Lang, The Odyssey of Homer 199-200 (MacMillan & Co. 1922) (1879). In today's vernacular, Ms. Deegan's choice was between a "Rock and a Hard Place."

sustained herself and her family on food stamps and whatever money she could acquire to provide food for her young children: ages one, two, and five. When Ms. Deegan obtained any money, Mr. Hale took it and bought methamphetamine.

Dr. Resnick explained why Ms. Deegan stayed with Mr. Hale before the homicide of her fourth child:

1)      Ms. Deegan was raised in a home in which she saw her father repeatedly beat her mother. This aberrant model of marriage was all she knew.

2)      Ms. Deegan feared that if she left Shannon Hale she would lose her relationship with the Hale family. . . . Irene Hale encouraged her to stay with Shannon so her children would have a father.

3)      Ms. Deegan had virtually no financial resources. Shannon Hale used any available money for his alcohol and methamphetamine addiction. Irene Hale at least made sure that Ms. Deegan had groceries so she could feed her daughters and herself.

4)      Based on Ms. Deegan's foster care experience, she knew that leaving one family situation sometimes resulted in a worse situation rather than an improvement.

5)      As is common in men who batter their wives, Shannon Hale told Ms. Deegan that he would not assault her again and promised to control his drinking and use of illegal drugs.

6)      Ms. Deegan did not have a viable alternative to staying with Shannon Hale. If she took her daughters to live in her parental home, she and her daughters would be subjected to physical and emotional abuse by her father. No shelter for battered women was available in her area.

7)      Ms. Deegan was fearful that if she left Shannon, Irene Hale, who enjoyed an excellent reputation in the community, would take her

daughters away from her. . . . Caring for her three daughters was the most important thing in her life. She feared that if Shannon Hale attempted to raise her three young daughters, they would not be safe because of his methamphetamine addiction and his demonstrated propensity for physical abuse.

8) Ms. Deegan feared that if she sought counseling for her marital problems, she might lose her daughters' custody.

9) On the prior occasions when Ms. Deegan sought help from individuals and institutions, they failed to assist or protect her.

Add. 2, p. 20-21 (Resnick Report).

## C. The Birth Circumstances

On October 20, 1998, at twenty-five years of age, alone in her mobile home with her three children, Ms. Deegan went into labor with her fourth child. She endured the labor alone, did not tell anyone she was in labor, and delivered the child herself. She reported not feeling anything physically from the labor and that she had assisted the infant to breathe when he was born. Ms. Deegan cleaned, diapered, and fed her child. She then put clothes on him, placed him in a basket, and left him in the home alone. When asked why she left her child in the home alone, she replied:

I couldn't take anymore. I couldn't handle it. I had everything on my shoulders. I couldn't even help myself. I had nobody to help me. I had no job, no nothing. I had all my babies to care for, a welfare mom. I had the feeling of being worthless. What could I do? I was overwhelmed and depressed. I didn't want to live through any of it anymore. I didn't want to be there anymore, as a spouse, as a mother, as a daughter.

Add. 2, p. 11 (Resnick Report).[12]  Ms. Deegan returned to her home approximately two weeks later.  Ms. Deegan put her son's body in a suitcase and placed the suitcase in a ditch near her home.  The body was discovered approximately one year later.

With an understanding of the background of Ms. Deegan and the circumstances surrounding the infant's death, I turn to a discussion of neonaticide.

## III.

## NEONATICIDE

Forty-three years ago, psychiatrist Dr. Phillip Resnick became interested in the topic of parents causing the death of their children.  He has written nearly 100 articles, several on neonaticide and infanticide, and frequently presents and lectures on this subject.  Every year he teaches a course on neonaticide for the American Psychiatric Association.  He is considered the foremost neonaticide expert in this country.

---

[12]Essentially, Ms. Deegan gave the same characterization of the circumstances to the FBI:

> Deegan stated that Shannon Hale was drinking heavily and using large amounts of drugs including methamphetamine.  He was frequently gone for days or weeks at a time.  Neither Deegan nor Hale were working, and she was having difficulty finding money to feed her children.  What little money she did manage to find, Hale would take and use for drugs.  Deegan essentially was the sole provider and care giver for herself and her three children.  She felt that having another child to care for was more than she could handle.  So, she left Baby Doe alone to die because she felt she could not care for another child under the circumstances.

Add. 2, p. 17 (Resnick Report).

As defined by Dr. Resnick:

[N]eonaticide is simply the killing of a newborn infant on the first day of life. It's actually a term that I coined in an article I wrote in 1969 where I was distinguishing that type of killing of a baby, which has very different characteristics, from the killing of a baby who is older or a child. And so neonaticide has universally been accepted now as a particular phenomenon when the baby is killed the first day of life.

Sent. Tr. 16.

Dr. Resnick and other scholars explain the circumstances that lead to this tragic crime. Such a mother is often in an overwhelming state of desperation at the time of her infant's birth and lacks adequate resources to mentally handle the situation of delivering a child.[13] She often conceals and denies her pregnancy, lacks insight into the situation, shows poor judgment, is cognitively immature with limited intelligence, and lacks sufficient coping skills.[14] "[The] commonly reported profile [of a homicidal mother] describes a woman usually in her twenties, who grew up or currently lives in poverty, is under-educated, has a history of abuse (both physical and sexual), remains isolated from social supports, has depressive and suicidal tendencies, and is usually experiencing rejection by a male lover at the time of the murders."[15]

"Although the majority of women who commit neonaticide do not have any long-term psychological pathologies, it is likely that often they experience abnormal

---

[13]*See* Drescher-Burke, K., Krall, J., and Penick, A., *Discarded infants and neonaticide: A review of the literature*, Berkeley, CA: National Abandoned Infants Assistance Resource Center, University of California at Berkeley, 4-5 (2004).

[14]*Id.*

[15]*See* Janet Ford, Note, *Susan Smith and Other Homicidal Mothers – In Search of the Punishment that Fits the Crime*, 3 Cardozo Women's L.J. 521, 538 (1996).

mental functioning during their pregnancies."[16]   "During a homicidal episode, therefore, a mother may view a child as a mere extension of herself rather than as a separate being.  A mother's suicidal inclinations may often transform into filial homicide.  In other words, killing her children may be much like killing herself."[17]

In preparing to testify, Dr. Resnick conducted a six-hour interview of Ms. Deegan and reviewed the relevant FBI, medical, psychiatric, and school records.  He diagnosed Ms. Deegan with suffering or having suffered from the following three psychiatric disorders:

> Major Depressive Disorder, recurrent, severe, without psychotic features at the time of the homicide, now in partial remission.
>
> . . . .
>
> Posttraumatic Stress Disorder, chronic.
>
> This diagnosis is supported by Ms. Deegan's history of exposure to multiple traumatic events as a child of physical and sexual abuse.  At the time she had intense feelings of helplessness, horror, and the fear of dying. . . .
>
> Dysthymic Disorder
>
> This diagnosis is based on the fact that during Ms. Deegan's childhood she had a depressed mood for most of the day for more days than not for several years.  Her depression was manifested by overeating, insomnia, low self esteem, and feelings of hopelessness.

Add. 2, p.13 (Resnick Report).  Dr. Resnick explained that at the time Ms. Deegan delivered her infant, she was severely depressed, overwhelmed by the state of her life,

---

[16]*See* Drescher-Burke, et al., *supra* note 9, at 5.

[17]*See* Ford, *supra* note 11, at 538.

and "simply did not have the psychological resources to care for a fourth child." Sent. Tr. 36.

Dr. Resnick further testified that women who commit neonaticide are unable to cope with the pregnancy and endure great pain at the expense of keeping the child's birth a secret:

> [Such women] are willing to put themselves through a great deal of anguish. They often will deliver the baby with no anesthesia, no pain relief, no emotional support. They'll stifle their screams, and that is how intensely important it is for them not to have their family, who may be in the house, actually know that they're pregnant and having a baby.

Sent. Tr. 33.

The manner in which Ms. Deegan delivered her child conforms with other women's acts of neonaticide. Ms. Deegan gave birth to the infant in the shower and kept the birth a secret. She coped with the pain of childbirth by dissociating.[18] Dr. Resnick explained that just as Ms. Deegan had endured sexual assaults as a child by having out-of-body experiences, she used dissociation to separate herself from the intense pain of delivering the infant.

Dr. Resnick also addressed Ms. Deegan's belief that she was not pregnant. Dr. Resnick explained that, as is common in cases of neonaticide, Ms. Deegan neither planned for the killing of the infant or for the caring of the infant. As he succinctly stated, "They just put it out of their minds." Sent. Tr. 28-29. Dr. Resnick further testified that in Ms. Deegan's case, it was particularly easy for her to convince herself that she was not pregnant because she had previously miscarried three times and had experienced regular menstrual spotting during her prior pregnancies. Dr. Resnick

---

[18]Dissociation is "like an out-of-body experience" wherein the integrative functions of the mind are dissociated from perception and experience. Sent. Tr. 35.

explained that even though Ms. Deegan may have known she was pregnant, she may have made the assumption that she might miscarry or just did not accept that she was truly pregnant.

Dr. Resnick also testified that the manner in which Ms. Deegan carried out the neonaticide indicated that it was an impulsive act. He explained, unlike one who hides evidence of a crime, Ms. Deegan left her infant in a place where he "might have been discovered and she would be caught." Sent. Tr. 29.[19] Dr. Resnick explained that such conduct is not what one would expect from someone who is planning to take another's life and seeks to "get away with it." Sent. Tr. 29. He further explained that despite her psychological inability to cope with raising the child, Ms. Deegan still sought to keep the infant close to her home because of her emotional attachment to him.[20] Dr. Resnick reasoned, "had it been other circumstances, [Ms. Deegan] would have cherished the baby." Sent. Tr. 30.

Finally, Dr. Resnick testified that Ms. Deegan did not have a significant support system from her family and community. She lived in a mobile home in a rural area of North Dakota. She lacked the financial resources to leave her abusive and troubled family life. Ms. Deegan did not have outreach services with which she could have received assistance, nor were there shelters for victims of domestic violence. At the time of her actions, North Dakota did not yet have a Safe Haven Law, whereby parents could bring a child for which they felt unable to provide care.[21] Further, individuals and institutions had consistently failed Ms. Deegan when she needed help.

---

[19]Ms. Deegan left the infant fifty yards from her home.

[20]When questioned as to why she placed the infant so close to her home, Ms. Deegan replied, "I wanted the baby close to me and I did not want to let him go." Add. 2, p. 12 (Resnick Report).

[21]North Dakota enacted a Safe Haven Law in 2001. *See* N.D.C.C. § 50-25.1-15.

-33-

It is apparent from Ms. Deegan's background and the expert testimony in this case that every adverse factor that may play some role in neonaticide was suffered to an advanced degree by Ms. Deegan.  As the dissent shows below, the district court made two critical errors in evaluating the record.  First, the court thought the guidelines applied to this case.  Second, the court recognized this testimony but failed to properly apply this important evidence in imposing its sentence.

## IV.

## REVIEW OF SENTENCING

### A.  Inapplicability of second-degree murder guidelines

Ms. Deegan's crime of neonaticide was a unique sort of homicide and completely unlike the usual and ordinary killings that constitute second-degree murder under federal law.  As I have already observed, federal courts do not ordinarily deal with these types of cases, which may be grist for the mills of state courts.  Only because this neonaticide occurred on an Indian reservation does this case become one of federal jurisdiction.  There exists no basis in the statements of the Sentencing Commission or in reviewing federal appellate second-degree murder cases to conclude that the crime of neonaticide comes within the federal second-degree murder sentencing guidelines.

First, consider the Sentencing Reform Act of 1984 and the goals of the United States Sentencing Commission.  It is axiomatic that the Sentencing Reform Act, through the imposition of mandatory guidelines, worked a sea-change in federal sentencing.  But even then, Congress recognized that the goals of certainty and uniformity must in some instances yield to unique circumstances:

These provisions introduce a totally new and comprehensive sentencing system that is based upon a coherent philosophy. They rely upon detailed guidelines for sentencing similarly situated offenders in order to provide for a greater certainty and uniformity in sentencing.

S. Rep. No. 98-225, at 38, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3221 (emphasis added). Likewise, the Sentencing Commission instructs that:

The sentencing court must select a sentence from within the guideline range. If, however, a particular case presents atypical features, the Act allows the court to depart from the guidelines and sentence outside the prescribed range.

U.S.S.G. ch.1, pt. A, intro cmt. n.2 (1997) (emphasis added). Thus both Congress and the Commission contemplated that not every crime would fall within the ambit of the guidelines.

The presentence report is lamentable in this regard. Despite the seemingly obvious fact that neonaticide is an unusual crime in federal court, the presentence report makes no mention that this is an "atypical" case. Even more distressing, the presentence report fails to indicate much in the way of the abusive circumstances Ms. Deegan faced during her childhood and at the time she gave birth to the infant victim. These circumstances, detailed so graphically in this dissent, were simply not a part of the presentence report, which asserted that no factors warranted departure from the guidelines.

Far worse than the omissions from the presentence report were the prosecutor's statements at sentencing, which lack any basis in fact or law, about the applicability of the guidelines to Ms. Deegan's conduct. At sentencing, Ms. Deegan's counsel requested a non-guideline sentence. But the prosecutor mistakenly informed the

district court that the Sentencing Commission took this type of crime into consideration in adopting the guidelines for second-degree murder:

> MR. HOCHHALTER: Yes, Your Honor. Your Honor, the United States Sentencing Commission was in existence back as early as the late eighties and certainly at the time of this event, and certainly at the time of events across the country where, as Dr. Resnick has pointed out, this has been occurring for many years. <u>The United States believes that the Sentencing Commission took into account these type of events, these type of crimes when it put together sentencing guidelines such as exist in the 1997 edition.</u> Given that fact, Your Honor, we believe that a guideline sentence would effectively meet the requirements of Section 3553, all of those goals of sentencing.

Sent. Tr. 42-43 (emphasis added). After this statement, defense counsel again urged, to no avail, that a guideline sentence was far greater than necessary.

Despite defense counsel's request, the district court determined – entirely without precedent – that the guidelines apply to "this type" of crime and that it believed application of the guidelines was "reasonable." The court stated:

> Well, I have carefully reviewed the presentence report, and I adopt the factual findings and the sentencing guideline calculations spelled out in that presentence report that establish that this offense carries a total adjusted offense level of 32, a criminal history category of 1.
>
> . . . .
>
> We have sentencing guidelines in the federal system that are designed to ensure that sentences are consistent and uniform throughout the country for people that commit <u>this type of crime</u> with the same type of criminal history that you have. The sentencing guidelines have been in effect for almost 20 years, and they are designed to provide some honesty in sentencing and to achieve some consistency in the federal

-36-

system, and they're based upon an analysis of hundreds of thousands of cases. Every year there are hundreds of thousands of cases that – in which defendants are sentenced around the country, and the Sentencing Commission compiles all that data and they try to develop sentencing guidelines that are fair and are reasonable.

In this case the sentencing guidelines provide for a sentence range of 121 to 151 months. That's 10 to 12-and-a-half years. I'm required to impose those guidelines that were in effect in October of 1998.

. . . .

Pursuant to the Sentencing Reform Act of 1984, it's my judgment, Ms. Deegan, that you shall be committed to the custody of the Bureau of Prisons to be imprisoned for a period of 121 months. I am agreeing with the Government's recommendation in this case and adhering to the guidelines because I believe that they are reasonable.

Sent. Tr. 55, 59, 60-61 (emphasis added). Notwithstanding the district court's belief, no basis exists to place neonaticide within the mine-run guidelines for second-degree murder.

The foundation statements for application of the sentencing guidelines in this case amounted to error of great proportions. Once Dr. Resnick's report became known, a modicum of research by any of the persons engaged in the sentencing process would have easily disclosed that the guidelines did not contemplate crimes

-37-

such as Ms. Deegan's.[22]  An obligation to inform the judge of the applicable sentencing procedures and law rested on the prosecutor.

In the seminal case of *Koon v. United States*, 518 U.S. 81 (1996),[23] the Court explained that the then-mandatory guidelines carve out a "heartland" of typical cases and the Court provided an approach for delineating which cases fall within that heartland.  *Koon* concerned the well-publicized conduct of Los Angeles police clubbing an arrestee, Rodney King, with their police batons.  *Id.* at 86-87.  In *Koon*, the applicable guidelines called for a sentencing range of 70 to 87 months' imprisonment for the convicted police officers.  *Id.* at 89.  The district court granted a downward departure for several reasons, which the Ninth Circuit rejected.  *United States v. Koon*, 34 F.3d 1416 (9th Cir. 1994).  The police officers petitioned for certiorari to the United States Supreme Court.  *Koon*, 518 U.S. at 91.

In the process of reviewing the sentence, the Court explained the difference between ordinary or typical guideline cases and the "unusual" one:

---

[22]The majority claims, "The [district] court never suggested that the Sentencing Commission based the guideline on an analysis of hundreds of thousands of 'neonaticide' cases, or that Deegan's offense was a typical fact pattern for second-degree murder."  Maj. op. at 12. The record does not support such an interpretation.  I emphasize again the district court's statement:  "We have sentencing guidelines in the federal system that are designed to ensure that sentences are consistent and uniform throughout the country for people that commit this type of crime with the same type of criminal history that you have."  Sent. Tr. 59 (emphasis added).

[23]*Koon* was superseded on other grounds by statute.  *See* 18 U.S.C. § 3742(e) (providing for *de novo* review of departures).  *See also Rita*, 551 U.S. at 361 (Stevens, J., concurring).  But of course, *de novo* review no longer applies after *United States v. Booker*, 543 U.S. 220 (2005).

A district judge now must impose on a defendant a sentence falling within the range of the applicable Guideline, <u>if the case is an ordinary one</u>.

. . . .

> The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. <u>When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.</u>

. . . .

> <u>The Commission, in turn, says it has formulated each Guideline to apply to a heartland of typical cases. Atypical cases were not "adequately taken into consideration,"</u> and factors that may make a case atypical provide potential bases for departure.

*Id.* at 92-94 (internal citations omitted) (emphasis added).

The Supreme Court noted that because of Mr. King's provocative behavior, the guidelines should not apply. *Id.* at 105. The Court quoted the district court's analysis of heartland cases:

> However, the convicted offenses fall under the same Guideline Sections that would apply to a jailor, correctional officer, police officer or other state agent who intentionally used a dangerous weapon to assault an inmate, without legitimate cause to initiate a use of force.

The two situations are clearly different. Police officers are always armed with 'dangerous weapons' and may legitimately employ those weapons to administer reasonable force. Where an officer's initial use of force is provoked and lawful, the line between a legal arrest and an unlawful deprivation of civil rights within the aggravated assault Guideline is relatively thin. The stringent aggravated assault Guideline, along with its upward adjustments for use of a deadly weapon and bodily injury, contemplates a range of offenses involving deliberate and unprovoked assaultive conduct. The Guidelines do not adequately account for the differences between such 'heartland' offenses and the case at hand.

*Id.* at 102-03 (quoting *Koon v. United States*, 833 F. Supp. 769, 787 (C.D. Cal. 1993)).

Applying this rationale, whether Ms. Deegan's conduct fell outside the heartland and therefore was not contemplated by the sentencing guidelines depends on whether her conduct significantly differed from the norm. "The norm" is certainly not what we have here–an American Indian woman so beset by the serious problems in her life she cannot cope with another child, cannot think with logic, and believes she has no alternative but to run away and abandon her newborn child. Tragic yes, typical no!

Is that just this writer's assumption? What is in and what is out of the heartland? To determine whether the Commission contemplated neonaticide by a mother in its guidelines for second-degree murder, this writer inquired of the Sentencing Commission. The response from Glenn Schmitt, Director of the Office of Research and Data for the United States Sentencing Commission, is of great interest:[24]

---

[24]This December 8, 2008, letter is on file in this writer's office. This writer provided copies to the panel.

We reviewed 157,000 federal criminal cases sentenced since June 2006 (the date when our records became stored electronically, which enables us to review them more quickly than when they were stored off-site in paper). We found 605 cases in which the guideline providing for the highest punishment as either murder (2A1.1), 2nd degree murder (2A1.2), voluntary manslaughter (2A1.3), or involuntary manslaughter (2A1.4). Of these, the offender was a woman in 51 cases. We've gone back into each of the 51 cases and reviewed them in light of your inquiry.

. . . .

In only one case did we find facts that meet the definition of neonaticide. In that case a 26-year-old mother gave birth to a child (her fourth) at home. She cleaned him, diapered[] him[,] dressed him, and fed him. She then placed him in a basket and left eh [sic] house with her other three children leaving the baby alone for two weeks. She testified that she knew the baby would die. When she returned and found him dead, she placed him in a suitcase and placed the suitcase in a ditch near her residence on an Indian reservation where it was discovered.

. . . .

. . . As you can see from this analysis, cases like this are exceedingly rare in the federal system. . . .

Mr. Schmitt's letter reflects that the Sentencing Commission was unable to locate another case of neonaticide besides the present case, which it described. Similarly, my research of non-habeas, federal appellate second-degree murder cases from 1975

to the present discloses only one other clear case of neonaticide, with a drastically lesser sentence than that imposed on Ms. Deegan.[25]

Further, *Rita v. United States*, 551 U.S. 338 (2007), makes clear that the district court erred in imposing a guideline sentence. In *Rita*, the Court reaffirmed that the Sentencing Commission intended for the guidelines to apply to the typical case but not to cases outside the "heartland." *See Rita*, 551 U.S. at 351 ("[The judge] may hear arguments by prosecution or defense that the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, USSG § 5K2.0[.]"). As the Court further explained, in a run of the mine case, the "Guidelines [ ] seek to embody the § 3553(a) considerations, both in principle and in practice." *Id.* at 350. Therefore, "[a]n individual judge who imposes a sentence within the range recommended by the Guidelines thus makes a decision that is fully consistent with the Commission's judgment in general." *Id.*

*Rita* establishes that no neonaticide case was considered in developing the guidelines. The Court in *Rita* stated that the Commission employed an empirical approach when developing the guidelines by examining tens of thousands of sentences. *Id.* at 349. The paucity of reported federal cases illustrates that neonaticide

---

[25]I briefly mentioned the *Tom* case in my introduction. In *Tom*, on appeal after reversal and remand in *United States v. Tom*, 494 F.3d 1277 (10th Cir. 2007), the Tenth Circuit affirmed a variance from the second-degree murder guideline range of 168-210 months to 70 months' imprisonment for a boyfriend who assisted in the killing of his 15-year-old girlfriend's son. 327 F. App'x at 94. This teenager gave birth in the bathroom of her mother's trailer on the Navajo Reservation, pleaded guilty to first-degree murder, and was sentenced to 44 months' probation. 327 F. App'x at 99. It is worthy of special note that this crime was committed on an Indian reservation and the defendants were sentenced in a federal district court.

cases were not included in the sampling. Thus, a neonaticide case clearly falls outside the "heartland" for second-degree murder sentences. Moreover, because neonaticide is not accounted for by the guidelines, a guideline sentence is not "a decision that is fully consistent with the Commission's judgment in general." *See id.* at 350.

When the prosecutor asserted, "[t]he United States believes that the Sentencing Commission took into account these types of events," Sent. Tr. 43, it is obvious that he had done no legal or other research on the matter. Yes, the Sentencing Commission examined second-degree murder cases when it formulated the guidelines for that offense. But that certainly does not mean the Commission contemplated neonaticide when formulating a sentencing range for second-degree murder offenses.

The prosecutor's incorrect statement became an error of law when the judge agreed that a guideline sentence needed to be applied. The judge believed that the guideline sentence in this particular case was "reasonable" because "[the guidelines] are designed to provide some honesty in sentencing and to achieve some consistency in the federal system, and they're based upon an analysis of hundreds of thousands of cases." Sent. Tr. 59. The judge stated that the guidelines apply "for people that commit this type of crime with the same type of criminal history that you [Ms. Deegan] have." *Id.* (emphasis added). But this conclusion is wrong.

In *Gall v. United States*, 552 U.S. 38 (2007), the Court affirmed the sentencing principles described in *Rita*.[26] The Court made clear that a district court should begin

---

[26]In describing *Rita*, the Court in *Gall* stated, "we held that when a district judge's discretionary decision in a particular case accords with the sentence the United States Sentencing Commission deems appropriate 'in the mine run of cases,' the court of appeals may presume that the sentence is reasonable." 552 U.S. at 40 (quoting *Rita*, 551 U.S. at 351).

all sentencing proceedings by correctly calculating the applicable guidelines range and that the guidelines apply in "mine run" cases. *Gall*, 552 U.S. at 40, 49. This case falls so far from the heartland of guideline sentencing that it is a complete stranger to crimes ordinarily charged and considered as second-degree murder. As such, the district court significantly erred in sentencing when it concluded that the guidelines provided a "reasonable" sentence for neonaticide.

The inapplicability of the second-degree murder guidelines to this case requires reversal and remand. The district court should not have applied a guideline sentence because this is not a "mine run" case. Instead, the district court should have focused significant attention on the § 3553(a) factors. As detailed in the following section, *Rita* explains that the appropriateness of a district court's § 3553(a) analysis depends on the circumstances of the case. 551 U.S. at 356. The circumstances here require a detailed and thorough analysis of the statutory sentencing factors, which the sentencing judge failed to do.

The majority reasons that Ms. Deegan's sentence is proper even if the case is not a run-of-the-mine case. Maj. op. at 14. That approach is wrong. Ms. Deegan's crime is not a run-of-the-mine case. The district court erred at the first step of the sentencing procedure. *See Rita*, 551 U.S. at 350-51. Based on *Rita* and *Gall*, the district court erred in sentencing Ms. Deegan, and her sentence must be vacated.

## B. Presumption of Reasonableness

The district court stated it was "required" to impose the guidelines that were in effect in 1998. Sent. Tr. 59. This amounts to a presumption and more that the guideline is reasonable. The further comment, "I am agreeing with the Government's recommendation in this case and adhering to the guidelines because I believe that they are reasonable[,]" in effect presumed the guidelines sentence was reasonable. Sent. Tr. 61. Such an approach is plain error in this circuit. *See Alvizo-Trujillo*, 521 F.3d at 1018 (stating that language that such a presumption applies is "a significant procedural error"); *Greene*, 513 F.3d at 907.

*Rita* makes clear that "[i]n determining the merits of these arguments [that the guidelines should not apply], the sentencing court <u>does not</u> enjoy the benefit of a legal presumption that the guidelines sentence should apply." 551 U.S. at 351 (emphasis added). Further, as stated in *Greene*, the district court's mandate is not to impose a "reasonable" sentence, but "to impose 'a sentence sufficient, but not greater than necessary, to comply with the purposes' of § 3553(a)(2)." 513 F.3d at 907 (quoting *United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006)).

## C. Section 3553(a)

I dissent from the majority's conclusion that the district court did not err in considering the 18 U.S.C. § 3553(a) factors.

In discussing sentencing procedure, the Court in *Rita* observed that the sentencing court must give reasons for the sentence "in the typical case." 551 U.S. at 356-57. Importantly, the Court adds:

The appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances.

. . . .

In the present context, a statement of reasons is important. The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority. . . . Circumstances may well make clear that the judge rests his decision upon the Commission's own reasoning that the Guidelines sentence is a proper sentence (in terms of § 3553(a) and other congressional mandates) in the typical case, and that the judge has found that the case before him is typical.

*Id.*

As explained, Ms. Deegan's crime was not "the typical case." Therefore, the district court could not just rely upon the Sentencing Commission's reasoning that the guideline sentence is a proper one. Instead, the district court needed to consider all of the § 3553(a) factors and make an individualized assessment based on the facts presented. *Gall*, 552 U.S. at 49-50.

The § 3553(a) factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for–

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines–

. . . .

(5) any pertinent policy statement–

. . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). With respect to § 3553(a), the sentencing judge made these comments at the sentencing hearing:

The request in this case is for the imposition of a variance or a nonguideline sentence to be imposed in accordance with 18 USC Section

3553(a). And I am very familiar with each and every one of those sentencing factors that I'm required to consider in every case. And believe me, I've carefully considered them in this case.

. . . .

In this case I have spent considerable time reflecting not only on the presentence report, but on the sentencing memorandums of the parties. I've carefully reviewed Dr. Peterson's psychological evaluation that I ordered. I've carefully reviewed Dr. Resnick's report. I've read it over at least three times. I've read every letter that was submitted in this case, letters of support. I have reviewed the DVD that was shown here in the courtroom several times. I've considered the testimony of Dr. Resnick today and the arguments of counsel.

And I was very impressed with Dr. Resnick's report and his testimony here today. To me it was helpful and insightful, and I have real respect for his opinions. He has – he's a nationally renowned specialist who has testified in some of the most famous cases that we have experienced here in the United States. And his report was a very reasonable, insightful report, and I have far better insight into what went on in this case after reviewing Dr. Resnick's report than I ever had at the time that I took a change of plea from Ms. Deegan.

And I certainly have a much better understanding today as to all the contributing factors and stressors that existed in her life back in 1998. And I know that you haven't had an easy life, Ms. Deegan. I know that it was plagued with physical abuse and sexual abuse, both at the hands of your father and the hands of the father of your children.

. . . .

And believe me, I have real compassion for you and your family and what you have gone through. . . .

But I also need to ensure that justice is done, and I don't know if anybody knows what justice is in this case. I reflected upon Mr. Hochhalter's [the prosecutor's] comment in his brief that justice lies between the extremes of public opinion, and that's probably a pretty fair assessment of where things lie in this case.

But after careful review of this entire record, I have in this case – and I'm aware of my discretion and authority to impose a nonguideline sentence or to depart from the guidelines. I have chosen in this case to impose a guideline sentence. I'm not going to exercise my discretion and depart and impose a nonguideline sentence because I believe that the sentence range that's been provided for in the sentencing guidelines in this particular case is reasonable. . . .

Sent. Tr. 56-59.

The majority finds this a satisfactory analysis of the § 3553(a) factors. I do not. The district court demonstrates familiarity with the sentencing record, but offers no analysis of the record as it relates to the statutory factors.

To be sure, the district court states, "I have carefully considered all of the factors." But this statement does not constitute an "explanation" for why a ten-year sentence is sufficient but not greater than necessary. *See Gall*, 552 U.S. at 51 (stating a failure to "adequately explain" a chosen sentence is significant procedural error). A "statement of reasons" explaining a particular sentence is not equivalent to stating "I have considered all of the factors." As explained in *Rita*, "[i]n the present context [§ 3553(a) analysis], a statement of reasons is important. The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking

-49-

authority." 551 U.S. at 356.[27] In my view, the district court never justified its sentence under § 3553(a). It becomes so very plain that the district court made the choice of a guideline sentence. However, it must follow that if the guidelines do not apply to Ms. Deegan's non-heartland crime, the court needed to explain its sentence with respect to every factor under § 3553(a) in order to arrive at a proper sentence. The district court's "reasons" for imposing this sentence are wholly inadequate.

The district court states, "I cannot ignore the fact that there was an innocent life that was lost, but believe me, I understand why you took the steps that you did. . . ." Sent. Tr. 60. This seems to be a "reason" for the sentence. But every neonaticide causes the death of a newborn child. That statement alone cannot justify this ten-year sentence.

The district court states, "I don't know if anybody knows what justice is in this case," but justice is reflected by the brief of the prosecutor that "justice lies between the extremes of public opinion. . . ." Sent. Tr. 58. Wrong! Public opinion should not factor into a sentence. The factors are those in section 3553(a). Public opinion is not disclosed by the record in this case.

The district court states it was "obligated to apply the [1998] guidelines," and also noted that if it applied the 2008 Guidelines in effect at the time of sentencing, Ms. Deegan's sentence "would be in the range of 19-and-a-half to 24-and-a-half years." Sent. Tr. 55, 59-60. Wrong! The faulty underlying premise of both comments is that the guidelines contemplated neonaticide.[28]

---

[27]I recognize that § 3553(a) does not "insist" upon a full opinion in every case, *Rita*, 551 U.S. at 356, but in a case like this, which presents circumstances far outside the ballpark of normal cases, *see Rita*, 551 U.S. at 365 (Stevens, J., concurring), the district court's explanation for imposing a ten-year sentence is insufficient. Here we have unstated "considerations" but almost nothing more.

[28]Furthermore, applying the guidelines in effect at the time of sentencing may be unconstitutional. *See* Maj. op. at 10.

-50-

The other "reason" offered by the district court for its sentence is the belief that a guideline sentence is reasonable. This is simply not supported by the law. As previously discussed, this is not a mine-run case to which the second-degree murder guidelines apply. In other words, the district court could not simply "rest[] his decision upon the Commission's own reasoning that the Guidelines sentence is a proper sentence. . . ." *Rita*, 551 U.S. at 357. Unfortunately, the district court did exactly that in sentencing Ms. Deegan.

But even more erroneous, in finding the guidelines "reasonable," the district court stood sentencing procedure on its head. As explained in *Greene*, a district court's job is not to impose a "reasonable" sentence. 513 F.3d at 907. The district court's job is to impose a sentence sufficient but not greater than necessary to comply with the purposes of § 3553(a). *Id.* Reasonableness is the appellate standard of review in judging whether a district court has accomplished that task. *Id.* Analysis of the § 3553(a) factors demonstrates the unreasonableness of Ms. Deegan's ten-year sentence.

### 1. Circumstances of the offense and characteristics of the defendant

This dissent amply describes the nature and circumstances of the offense and the history and characteristics of the defendant. This factor favors leniency. The district court never explained how the nature and circumstances of the offense and history and characteristics of Ms. Deegan supported its determination that a ten-year sentence was sufficient but not greater than necessary.

### 2. Deterrence and recidivism

As to deterrence, Dr. Resnick testified that incarcerating Ms. Deegan would not likely deter other individuals from committing neonaticide. He explained that deterrence was unlikely for several reasons, including:

[T]hat since Ms. Deegan's crime, safe haven laws have been passed in all 50 states, and now if a woman feels overwhelmed by a baby, whether she's a teenager or whatever, she can drop that baby off at a hospital or a police station, no questions asked, and not have to kill the baby. And there have been more than a thousand drop-offs since those laws have begun to be passed in 1999.

Secondly, when a women [sic] commits neonaticide, most of the cases it is a teenager. Actually, the mean age for neonaticide in the United States is age 19, and most of these young women are . . . willing to put themselves through a great deal of anguish.

. . . .

And women who are willing to put themselves through that I don't think are going to be significantly influenced by whether someone is sentenced to ten years or two years or probation.

Sent. Tr. 33-34.

As to recidivism of Ms. Deegan, Dr. Resnick stated:

Ms. Deegan presents an extremely low risk that she would commit any further conduct which was criminal in nature. With regard to harming a future baby, that's a nonissue because Ms. Deegan has had a tubal ligation. She's not going to have any more babies.

With regard to other criminal conduct, Ms. Deegan has been a law-abiding citizen her entire life, has no juvenile offenses, no adult offenses, not an alcohol or drug abuser, which is associated with criminality, has shown considerable remorse for what she has done, and is no longer in the desperate situation that she was in October 1998, where she was abused, overwhelmed, did not feel that she could care for

-52-

the baby, didn't feel she could keep her babies – her three existing children safe if she was overwhelmed with another baby.

And the one follow-up study which has been done in women who have killed newborn children shows that most of them go on to marry and be good mothers, and that suggests that this is a crime which is based upon circumstances as opposed to bad character in the perpetrator.

And in Ms. Deegan's case, we have an example of where she has already in the nine years between the act and being brought to trial, has already demonstrated the quality of being a good mother, so rather than have to prognosticate, we have a nine-year period where we can show that she has got her life together, been a good mother, and not been a risk to the community.

Sent. Tr. 31-32. Dr. Resnick added:

[In spite of the abuse to Ms. Deegan], she has been a devoted, caring mother and made every effort to protect her children, raise her children to be good citizens so that – you know, there are occasions when there's what's called a cycle of violence where children who are abused go on to abuse their children. Not all mothers do that, but some do, and Ms. Deegan has taken a protective role and made sure that her children are well cared for.

Sent. Tr. 32.

As this testimony shows, the evidence before the district court overwhelmingly established that incarcerating Ms. Deegan would not deter others from committing neonaticide and that Ms. Deegan would not commit future crimes.

As with the first sentencing factor, the district court never addressed what role deterrence and recidivism played in its ten-year sentence. Thus appellate review

-53-

seems limited to noting that (1) this factor favors leniency; and (2) the district court never expressly discussed this factor.

### 3. Seriousness of offense

Of course neonaticide is a serious offense–as is any offense causing loss of life. Dr. Resnick provided some interesting background as to how other governments look at neonaticide.

> There are 26 countries that have a particular law called an infanticide statute. This exists in Canada. It exists in England. It exists in Australia. And these countries have recognized that a woman taking a young baby is sometimes due to psychiatric factors, and finding them guilty of murder just does not comport with their sense of justice. So the persons found guilty of infanticide, rather than murder, have the equivalent sentence of voluntary manslaughter, rather than murder. And in England, most of these women who are found guilty of infanticide are placed on probation. They're not considered a danger to the community.

Sent. Tr. 30.

Despite all of the reasons given by defense counsel, the prosecutor and court's sole reason (besides reliance on the guidelines) for imposing a ten-year prison sentence was the tragic death of the infant. While it is tragic that a life was lost, that is the nature of any neonaticide. That alone is not sufficient to justify this sentence.

### 4. Family ties

While the guidelines do not ordinarily consider matters such as family ties, such a consideration is permissible under § 3553(a). *Rita*, 551 U.S. at 364-65 (Stevens, J., concurring). The defense presented and the court received as evidence a DVD relating

-54-

to the Deegan family.  In that presentation, Ms. Deegan's younger sister related that Ms. Deegan protected her small siblings against the vicious abuses which their father sought to inflict.

Also Ms. Deegan's children exhibited their Native Indian regalia made by Ms. Deegan.  The youngest child described Ms. Deegan as smart, pretty, and elegant.

In her allocution, Ms. Deegan spoke of her children's needs for her:

> I've written a letter I'd like to read to you.  [Judge], with respect to the Court, my family and my community, I am humbly addressing you today asking for a downward departure from the sentencing guidelines, not for my own sake, but for the sake of my daughters.  They are at the age where they need me most now.  I have spent my life trying to protect them from all [ ] that I had to endure.  They need me to guide them, to love them and help them get through this difficult time, and to continue to help them grow to be grown good women.

Sent. Tr. 54.

Instead of the prosecutor acknowledging that the children's needs can play a role in reducing a federal sentence, he justified the guideline sentence saying, "[T]he punishment that comes to those siblings as well comes at the hand of the defendant. Basically her choice is what has caused all of this."  Sent. Tr. 53.  With respect to these comments, I offer this observation as to the laying of blame.  There is plenty of blame to go around.  Ms. Deegan's father is dead.  But what blame should be placed on Mr. Hale who did not support the children he fathered and consistently abused Ms. Deegan?  And what about the failures of society to assist Ms. Deegan in her travail?

-55-

When it comes to blame, Dr. Resnick's report needs to be recalled:

a)    When Ms. Deegan reported being the victim of sexual abuse to her mother at age 11, she reasonably expected protection from further abuse. Instead, she received a beating from her father for "whoring."

b)    After being removed from her parents by the Child Protective Service, Ms. Deegan reasonably expected protection from further abuse. Instead, she was later returned to her parents and suffered further physical abuse from her father. Furthermore, while in some foster homes, she was physically abused.

c)    When Ms. Deegan became a foster daughter to Irene Hale, she reasonably expected to be safe from physical abuse. Instead, she was physically abused by Irene's son, Shannon Hale.

d)    When Ms. Deegan participated in joint therapy sessions with Shannon Hale in his substance abuse treatment, she reasonably expected Shannon's behavior to improve. Instead, Shannon beat her for "running her mouth."

e)    When Ms. Deegan filed for a restraining order against Shannon Hale, she reasonably expected protection. Instead, a court officer took Shannon home to their trailer drunk.

Add. 2, p. 21 (Resnick Report).

Indeed, the great improvement in lifestyle by Ms. Deegan after escaping her abusive home meant a better life for her family. Did the prosecutor or the district court give any weight to that accomplishment? No! Yet that factor lends strong support to a lenient prison sentence. *See Gall*, 552 U.S. at 59 (stating that the district court gave this factor "great weight").

## 5. Promoting respect for the law and avoiding disparity

A district court should consider whether a sentence promotes respect for the law and consider the need to avoid unwarranted disparity among defendants who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(2)(A) and (a)(6).

The sentencing record reveals that defense counsel informed the court of another neonaticide crime in the State of North Dakota, but committed by a young woman, off the Indian reservation and, thus, subject to North Dakota state laws. As the defense counsel described the case:

> There was an NDSU student who gave birth to a child, wrapped the baby up, stuck the child under a bed, and then ultimately disposed of the child, very similar kinds of situations here. That person got three years probation. Now, granted, certainly there are always differences in every case, but my point, Your Honor, is that if this had happened perhaps off the reservation, the consequences or at least the potential consequences are significant. And in disparity situations. I don't think you can operate in a vacuum, that you're dealing simply with disparities in the federal system. I think you have to look at what goes on.

Sent. Tr. 51.

The prosecutor stated:

> Your Honor, just to clarify, I think counsel suggested that [the] [ ] case in Cass County was three years probation. I'm wondering if it was three years prison term that was the sentence in that case. I'm not positive, but I believe it was a prison term.

Sent. Tr. 52-53.

Also, Dr. Resnick informed the court that women who plead guilty to neonaticide are "infrequently sentenced to more than three years in prison." Add. 2,

p. 24 (Resnick Report). These are all state sentences and, as observed by the majority, ordinarily state sentences are not germane to showing disparities in sentencing.

But here, we ought to consider the difference in sentence between (1) Ms. Deegan, a woman living in North Dakota and generally subject to state and tribal laws, except as to some aspects of federal law because of her residency on an Indian reservation, and (2) a North Dakota woman who committed a neonaticide crime off the reservation.

As the court said in *Gall*, quoting with approval the reasoning of the district court:

> the unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."

*Gall*, 552 U.S. at 54 (citations omitted).

This statement echoes the situation here. What respect should be given to federal criminal law which imposed a harsh punishment for this woman's crime on the reservation, when compared to the lenient sentence upon a woman off the reservation for this special crime of neonaticide? I submit that the sentence here promotes disrespect for the law and the judicial system.[29]

In this regard, a letter from Ms. Deegan's sister to the court before sentencing becomes relevant and significant:

---

[29]*See* Carol A. Brook, *Racial Disparity Under the Federal Sentencing Guidelines*, 35 Litigation, 15, 19 (Fall 2008) (explaining that sentencing policies that contribute to unwarranted disparity affect the efficaciousness of the goals of the criminal justice system).

Our family has endured depression, anxiety, and post-traumatic stress disorder [PTSD]. Our childhood home was a war zone; there were some good times of laughter and love, but one never knew when an attack of rage and violence was about to happen.

Our family has taken great lengths to reconcile the pain and scars that have been left on our souls. Understanding the intergenerational historical trauma of our American Indian Grandfathers and Grandmothers that came before us, has helped my family to forgive and love our father, knowing that he too suffered. Non-Indian people may not easily internalize this sense of loss and powerlessness so deeply ingrained by American Indian people still today. The cultural deprivations and discriminations of our people merely because of our heritage has contributed to the psychological deficits that Dana, at that particular low time in her life, was unable to overcome. <u>I fear that these same cultural factors may also contribute to harsher penalties of an already oppressed woman.</u>

. . . .

She was then as she is now, only trying to survive while caring for her daughters. She has spent her adult life trying to protect her children from a life she had to endure. If Dana is sentenced to prison, it is yet another tragedy, this time in the name of justice, that her daughters will be victims too.

R. at 29 (attachment to Defendant's Sentencing Memorandum, sealed in the district court) (emphasis added).

Reading this letter should give us all pause. How many of us can really comprehend the misery of Ms. Deegan's situation as described in this record? None of these matters made any difference to the district court when sentencing under the guidelines. I ask what respect should be given to this guideline sentence?

The sentence here is unjust, excessive, and treats a woman on the reservation disparately with a woman off the reservation. Does this disparity not indicate another example of unfair treatment of an American Indian living on a reservation?

In summary, with respect to § 3553(a) the district court committed several errors. The district court believed the the that the guidelines were "reasonable" and that they applied to Ms. Deegan. Wrong! This is not a mine run case.

The district court's § 3553(a) analysis was wholly insufficient considering the circumstances of this case. The statute and the Supreme Court require a statement of reasons, which in this case was not satisfied by the district court's statement that it "considered" the statutory factors.

The district court expressly relied on the Commission's view of an appropriate sentence, but the Commission never considered neonaticide. Examination of the record in light of the § 3553(a) factors shows the substantive unreasonableness of Ms. Deegan's sentence.

Finally, the district court never explained how this ten-year sentence comports with the most crucial aspect of sentencing: that a sentence be sufficient, but not greater than necessary to comply with the purposes of § 3553(a). Instead, the court imposed an almost mechanical sentence based on its erroneous view that the guidelines applied to "this type of crime."

### D. Guideline Sentence as Virtually Mandatory

The reader may wonder how an experienced prosecutor and a well-regarded district judge could err so grievously in the imposition of this sentence. Justice Souter's separate opinion in *Rita* may suggest the answer:

> What works on appeal determines what works at trial, and if the Sentencing Commission's views are as weighty as the Court says they are, a trial judge will find it far easier to make the appropriate findings and sentence within the appropriate Guideline, than to go through the unorthodox factfinding necessary to justify a sentence outside the Guidelines range.

*Rita*, 551 U.S. at 391 (Souter, J., dissenting) (citations omitted).[30] Moreover, as Justice Stevens commented, "I am not blind to the fact that, as a practical matter, many federal judges continued to treat the Guidelines as virtually mandatory after our decision in *Booker*." *Id.* at 366 (Stevens, J., concurring).

I ask isn't that precisely describing the sentencing procedure and comments here?

The majority stresses discretion by the district court. Maj. op. at 15. But the sentencing judge did not exercise his discretion. He merely adopted the recommendation of the prosecutor for a guideline sentence. Rather than consider the specific facts and circumstances in this case, the district court imposed a guideline sentence. This court addressed the limits of "discretion" in the pre-guideline case of *Woosley v. United States*, 478 F.2d 139 (8th Cir. 1973) (en banc).

*Woosley* arose thirty-seven years ago when appellate courts almost never reviewed the district court sentence. *See Gore v. United States*, 357 U.S. 386 (1958). The relevant facts are as follows. A sincere and religiously motivated member of Jehovah's Witnesses had refused a conscientious objector classification in the Selective Service draft and had refused to report for induction. 478 F.2d at 140. The

---

[30]*See also* Brook, *supra* note 29, at 18 ("[T]he gravitational pull of the guidelines remains strong.").

sentencing judge in *Woosley* recognized the defendant "as a fine young man." *Id.* However, the judge gave him the maximum sentence under the law (five years) pursuant to the judge's policy of <u>always</u> imposing the maximum penalty to men who refused induction into the military. *See id.* at 140, 143. That sort of sentence was imposed regardless of the underlying circumstances as to each defendant.

The *Woosley* court said, "we deal with a predetermined sentence resting upon a policy followed by the trial judge. . . . A <u>mechanical approach</u> to sentencing [that] plainly conflicts with the sentencing guidelines announced by the Supreme Court. . . ." 478 F.2d at 143 (emphasis added) (citation omitted).

Here, rather than looking at the law espoused by the Supreme Court and truly considering what sentence was sufficient but not greater than necessary, the court imposed the guideline sentence. It blindly followed the government's belief "that the Sentencing Commission took into account these type of events, these type of crimes when it put together sentencing guidelines. . . ." Sent. Tr. 43. Interestingly, the district court observed that Ms. Deegan's life had not been easy and he expressed compassion for what she had gone through. But the judge disregarded the specific circumstances of her crime and imposed the guideline sentence. This case was out of the "heartland" and did not fall within the guidelines sentence structure. Despite that, the district court failed to exercise its discretion in imposing a sentence.

In *Woosley*, the court observed that the great majority of individuals committing a similar crime received probation, not a jail sentence. 478 F.2d at 147. Here the judge gave no consideration to the plea for a lenient sentence, even though that matter was brought to his attention by defense counsel and Dr. Resnick. The sentence in this case manifests a gross abuse of discretion.

The *Woosley* en banc court concluded the opinion with this language, which I suggest is very pertinent to this case:

> We find it difficult to conceive of a situation offering more compelling circumstances to justify leniency than that in the instant case.
>
> . . . .
>
> The broad and unreviewable discretion possessed by federal district courts in matters of sentencing does not extend to the meting out of punishment manifestly disproportionate to the nature of the crime and the character of the criminal.

*Id.* at 147-48. Although in a different time and relating to a different crime, the two cases have parallels.

Yes, this judge stands by the view that district courts should exercise discretion in sentencing. But that discretion is not unfettered. *United States v. Burns*, 577 F.3d 887, 897 (8th Cir. 2009) (en banc) (Bright, J., concurring). The record here makes clear that the district judge exercised no discretion but merely agreed with and adopted the government's recommendation and applied the guideline sentence. This amounted to grievous, gross error.

## VII.

## REMEDY

A simple remand for resentencing will not do. This neonaticide crime is a novel one in the federal courts. As I have noted, I have never seen a crime as completely out of the "heartland" as this one. As such, this court should provide the district court with guidance. In *Woosley*, the circuit court remanded the sentence to the district

-63-

court with special instructions, including one for the court to consider "changed family circumstances which may disclose additional considerations dictating leniency of treatment." 478 F.2d at 148. Moreover, pending disposition of the en banc appeal, this court released Woosley from prison on his personal recognizance. *Id.* at 140 n.2.

In Ms. Deegan's circumstances, I suggest that (1) she be immediately released from prison pending disposition of this appeal and resentencing; (2) the district court reconsider the creation of a sentencing disparity between two North Dakota women who both committed neonaticide; and (3) the district court consider imposing a new sentence to time served in prison.

Regardless of the above suggestion, what judicial or societal harm can come from a remand? The process of remanding for resentencing goes on every day in the federal courts.

## VIII.

## CONCLUSION

Ms. Deegan's case cries out for justice and a reversal. The guideline sentence for second-degree murder does not apply to her crime of neonaticide. Ms. Deegan has suffered enough. I will not put my imprimatur on this harsh sentence, which reeks with error in the sentencing process. Ms. Deegan has suffered immense cruelty at the hands of her father, his male friends, and the father of her children. Now her lifetime of travail becomes magnified by an unjust and improper prison sentence. Her sentence of ten years' incarceration rests on a misreading or ignorance of the law.

For almost the first time in a federal appeal, this court addresses the fairness of a sentence imposed on a woman on the Indian reservation whose prior life has been

a "hell" and where the punishment ignores the needs of her children, who were the objects of her protection in committing a tragic crime.

In essence, the issue in this case is whether the district court imposed a sentence under § 3553(a). The majority says it did. Maj. op. at 13-14. I believe the answer is a resounding No! The problem with the majority's analysis is that the very words of the actors in the sentencing process seem to disagree.[31]

In mine run cases, the guidelines account for § 3553(a), *see Rita*, 551 U.S. at 350-51, which lessens the need for extensive discussion of the § 3553(a) factors. The Sentencing Commission never incorporated the § 3553(a) factors into a guideline that applies to the crime of neonaticide; thus Ms. Deegan's guideline sentence cannot embody the § 3553(a) factors. Because the sentencing court could not properly rely on the guidelines, Ms. Deegan's sentence required a full analysis of these statutory sentencing factors.

The majority relies on mine run cases for the proposition that district court judges need not say much about the sentencing factors. *See* Maj. op. at 6-7 (citing *Rita v. United States*, 551 U.S. 338 (2007) (mine run perjury, obstruction of justice, making false statements); *United States v. Robinson*, 516 F.3d 716 (8th Cir. 2008) (mine run conspiracy to commit bribery); *United States v. Hernandez*, 518 F.3d 613 (8th Cir. 2008) (mine run possession of methamphetamine with intent to distribute); *United States v. Perkins*, 526 F.3d 1107 (8th Cir. 2008) (mine run revocation of

---

[31] The probation officer said that no factors warranted a departure. Rev. PSR ¶ 63 ("None"); *see also supra* at 18-19. The prosecutor said "a guideline sentence is the right choice." Sent. Tr. 53; *see also supra* at 19. The district court said "I'm required to impose those [1998] guidelines . . . I am agreeing with the Government's recommendation . . . and adhering to the guidelines because I believe that they are reasonable." Sent. Tr. 59, 61; *see also supra* at 19-20. But the guidelines do not apply to neonaticide.

supervised release); *United States v. Henson*, 550 F.3d 739 (8th Cir. 2008) (mine run felon in possession)).  But Ms. Deegan's case is not a mine run case.  This court should not sanction this guideline sentence nor the cursory discussion of the § 3553(a) factors.

The majority relies on the district court's presentence order to conclude that a court "could" reasonably view Ms. Deegan's offense as "unusually heinous, cruel, and brutal."  Maj. op. at 14.  According to the majority, this characterization of Ms. Deegan's actions demonstrates the substantive reasonableness of her sentence.  But the district court ultimately rejected the characterization on which the majority relies.  The "heinous, cruel, and brutal" language in the district court's presentence order simply recites U.S.S.G. § 5K2.8, on which the district court contemplated, but rejected, a sentencing departure.  *See* Maj. op. at 3-4.  Importantly, the presentence order contemplating the departure was issued before the district court or any participants in the sentencing process knew any substantial amount of information about Ms. Deegan's background and about neonaticide.  The majority's revival of "heinous, cruel, and brutal" does not reflect the views of the district court, nor those of a leading expert on neonaticide, and I strongly dispute that characterization of Ms. Deegan.

The majority criticizes the dissent for comparing Ms. Deegan's case to that of another North Dakota neonaticide.  Maj. op. at 16-17.  The majority asserts that almost nothing is known about the other North Dakota neonaticide that was committed by an NDSU student.  True, the details underlying her crime are not part of the sentencing record.  But a comparison of these women's circumstances from the record, in light of Dr. Resnick's discussion of the § 3553(a) factors as related to neonaticide, strongly indicates that Ms. Deegan is entitled to a lenient sentence, similar to that of the NDSU student.  And if the information before the judge and the testimony of Dr. Resnick was insufficient, it should have been a red flag to investigate

further to determine whether the circumstances of the NDSU case were comparable to those of Ms. Deegan.

In any event, what we do know about the other North Dakota neonaticide supports overturning Ms. Deegan's harsh sentence. Both women committed neonaticide. Both did so in North Dakota. But Ms. Deegan committed her crime on a reservation and landed in federal court. Dr. Resnick reported that most women receive sentences of not longer than three years' incarceration, s*ee* Add. 2, p. 24 (Resnick Report), and the NDSU student received three years' probation. On this record, there is no just reason for the sentencing disparity between these two women. As I previously asked, what respect should be given to federal criminal law which imposed a harsh punishment for Ms. Deegan's crime committed on the reservation, when compared to the lenient sentence upon a woman off the reservation? Might an informed observer say: just another injustice by the United States which Indians must suffer.

The comparison of these two cases relates not to whether a federal court should rely on state sentences, but is an issue of unfairness and injustice to an Indian woman living on a reservation as compared to a woman not living on a reservation. The majority may say different laws apply. The difference here rests not on the law, but on the mistakes and misjudgment by a federal court as shown by the record.

I firmly believe that in these United States, through its courts or otherwise, Ms. Deegan will receive Equal Justice Under the Law.

This case also lifts the curtain on the terrible abuse suffered by Ms. Deegan as a young child and young woman on the Fort Berthold Indian Reservation in North Dakota. Unfortunately, her suffering is not an isolated instance. The pervasive and terrible abuse of women and children occurs on every Indian reservation in this country. I address that matter in the Appendix to this dissenting opinion.

**APPENDIX TO DISSENT**

**LIFTING THE CURTAIN ON ASSAULTS AGAINST WOMEN AND CHILDREN IN INDIAN COUNTRY**

In the dissent, I raise the question: where were the government and social agencies during the many instances of physical, verbal, and sexual abuse suffered by Ms. Deegan as a child and young adult, as well as her younger sisters and mother?

This dissent in part has examined the root cause, abuse after abuse after abuse suffered by Ms. Deegan, that underlies the tragic death of the infant victim. Is that abuse isolated to the Fort Berthold Indian Reservation or symptomatic of an existing situation in all of Indian country?

Coincidentally, in examining the background of assault and abuse in this case, a revealing and pertinent article about violence and sexual assault in Indian country appeared in a popular legal publication. The article entitled, *Strange Justice in Indian Country*, appeared in the National Law Journal of September 28, 2009. It reads in part:

> Conditions in this obscure country, as reported by sources ranging from Amnesty International to a U.S. Senate committee, are appalling. One in three women will be raped in her lifetime. Half the reported murders and 72% of child sex crimes are never prosecuted. Ninety percent of sexual assaults on native women are committed by men from the dominant ethnic groups. The nation's highest courts regularly reverse convictions based solely on the defendant's race.
>
> This country is not Sudan, Rwanda or Kosovo during ethnic cleansing. Rather, this is the state of law enforcement today on the 310 Indian reservations that are home to nearly a million Native American citizens of the United States.

"Indian Country" – the federal government's name for the 54 million acres of reservation lands in the United States–is larger than Minnesota or Utah. The layers of social ills on most reservations–alcohol and drug abuse, unemployment, malnutrition and chronic disease–are a well-documented national shame. But the failure of the U.S. government to provide equal legal protection to victims of serious crimes, who happen to be Native American, is just bizarre.

. . . .

The treatment of native peoples is one of the darkest chapters in American history. Although nothing can be done to change that history, extending basic legal protections to residents of Indian country, equal to those enjoyed by their fellow citizens, is a modest goal.

As the dissent notes, the abuse and beatings perpetrated upon Ms. Deegan as a child and young woman by her father, his friends, Mr. Hale, and others, although known by some officials of tribal institutions, were never investigated, prosecuted, nor the subject of correction. Ms. Deegan as an Indian woman does not stand alone as a victim of abuse.

Violence against American Indian women is a pervasive problem. Federal government studies consistently show that American Indian women are more likely to be subject to sexual violence than other women in the United States.[32] In fact, American Indian women are more than two-and-a-half times more likely to be raped

---

[32]*Maze of Injustice:  The Failure to Protect Indigenous Women from Sexual Violence in the USA*, Amnesty International USA 2 (2007).

or sexually assaulted than other women.[33]  More than one out of every three American Indian women will be raped during their lifetime.[34]

American Indian women are not only more likely to be raped and sexually assaulted, but are also more likely to suffer a higher degree of additional physical violence during those assaults.  While 30 percent of the general population of United States women report suffering physical injuries in addition to a rape, 50 percent of American Indian women report such injuries.[35]  American Indian women are also more likely to be a victim of a rape with a weapon.[36]  While 11 percent of all reported rapes involve the use of a weapon, 34 percent of female American Indian rapes involve a weapon.[37]

Notably, survivors of such brutal rapes and assaults suffer physically, emotionally, and spiritually.[38]  American Indian women who have been sexually assaulted report higher rates of depression, alcoholism, drug abuse, and suicidal ideation.[39]

---

[33]*Id.*; *see also* Amy Radon, *Tribal Jurisdiction and Domestic Violence:  The Need for Non-Indian Accountability on the Reservation*, 37 U. Mich. J. L. Reform 1275, 1280-81 (2004) ("[F]or every 1,000 American Indian females, 23.2 were victims of intimate violence.  This rate of victimization was nearly double that of African Americans (11.2 for every 1,000), triple that of whites (8.1 per 1,000), and twelve times the victimization rate of Asian Americans (1.9 per 1,000).").

[34]*Maze of Injustice:  The Failure to Protect Indigenous Women from Sexual Violence in the USA*, Amnesty International USA 2 (2007).

[35]*Id.* at 5.

[36]Sarah Deer, *Sovereignty of the Soul:  Exploring the Intersection of Rape Law Reform and Federal Indian Law*, 38 Suffolk U. L. Rev. 455, 457 (2005).

[37]*Id.*

[38]Sarah Deer, *Toward an Indigenous Jurisprudence of Rape*, 14 Kan. J. L. & Pub. Pol'y 121, 123 (2004).

[39]*Id.* at 124.

In addition to pervasive and damaging sexual violence, American Indians are more likely to be victims of all violent crimes than any other race.[40] In fact, American Indians experience a per capita rate of violence twice that of other United States residents.[41] The same is true for American Indian women, who are over two times more likely to be victims of violence.[42]

American Indian children are often victims of abuse. One American Indian child out of 30 is subject to abuse or neglect.[43] American Indian children are approximately twice as likely to be victims of child abuse than the general population of children.[44]

Sadly, violence and abuse on Indian reservations are likely greater than depicted in these statistics. It is widely-accepted that reports of abuse and violence on Indian reservations are under reported.[45] Although "[v]iolence against women is one of the most pervasive human rights abuses[,] [i]t is also one of the most hidden."[46] "Most Indian women do not report such crimes because of the belief that nothing will be done."[47]

---

[40]U.S. Dep't of Justice, *American Indians and Crime*, v (Dec. 2004).

[41]*Id.* at iv.

[42]*Id.* at v.

[43]U.S. Dep't of Justice, *American Indians and Crime*, 15 (1999).

[44]*Id.*

[45]*Maze of Injustice: The Failure to Protect Indigenous Women from Sexual Violence in the USA*, Amnesty International USA 2 (2007).

[46]*Id.* at 1.

[47]*Id.* at 2 (quoting Juana Majel, National Congress of American Indians, and Karen Artichoker, Cangleska, Inc.-Sacred Circle). As this report explains, "interviews with survivors, activists and support workers across the USA suggest that available statistics greatly underestimate the severity of the problem. In the Standing Rock Sioux Reservation, for example, many of the women who agreed to be interviewed could not think of any Native women within their community who had not been subjected to sexual violence." *Id.*

Pictures occasionally speak louder than words. The attached illustration[48] depicts a young American Indian girl in native dance regalia and emphasizes to the reader the importance of protecting "the integral parts of [Indian] life."[49] The high risks of violence to which American Indian women and children are exposed to on their reservations requires urgent action by federal agencies, tribal personnel, and other social services, and they should do all in their power to stop this terrible and continuing abuse.

I conclude with this comment. The violence against women and children on Indian reservations is a national scandal. It must be addressed not only as a criminal matter but as a societal concern. If the violence against Ms. Deegan had been stopped, even as late as her association with Mr. Hale, and, if she had been given moral and societal assistance in raising the three children in her family, this crime of neonaticide might never have occurred. The deterrence to such a crime, as here, will not be attained by imposing a harsh punishment on Ms. Deegan. The problems of preventing assault and abuse against women and children in Indian country need illumination, and immediate steps must be taken to stop this terrible and wrongful conduct.

_____

---

[48]Reproduced with the permission of the State Historical Society of North Dakota and its publication, North Dakota History: Journal of the Northern Plains, Vol. 69, front cover (2002).

[49]*Id.* at back cover.



# North Dakota History

## Journal of the Northern Plains

Vol. 69, Nos. 2, 3, & 4 • 2002 • $17.95

NORTH DAKOTA
STATE DEPOSITORY
DOCUMENT

F
631
N 862
V. 69
no. 2—4

NORTH DAKOTA STATE UNIVERSITY
3 0109 01135 9356

At The Confluence: Now and Then
Papers Presented at the Symposium Held in Williston, North Dakota, June 29, 2002